**PILGRIM ENTERPRISES, INC.; Pilgrim Convenience, Inc.; R & G No. 1, Inc.; R & G No. 2, Inc.; R & G No. 3, Inc.; Pilgrim Laundry Company, Inc.; Pilgrim Equipment Co., Inc.; R.F.S., Inc. No. 8; R.F.S., Inc. No. 11; R.F.S., Inc. No. 17; S & R No. 2, Ltd.; and PLC No. 11 Joint Venture, Appellants,**

v.

**MARYLAND CASUALTY COMPANY, Appellee.**

**Maryland Casualty Company, Appellant,**

v.

**Pilgrim Enterprises, Inc.; Pilgrim Convenience, Inc.; R & G No. 1, Inc.; R & G No. 2, Inc.; R & G No. 3, Inc.; Pilgrim Laundry Company, Inc.; Pilgrim Equipment Co., Inc.; R.F.S., Inc. No. 8; R.F.S., Inc. No. 11; R.F.S., Inc. No. 17; S & R No. 2, Ltd.; and PLC No. 11 Joint Venture, Appellees.**

No. 01–97–01421–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 22, 2000.

Michael A. Pohl, Maria Teresa Arguindegui, Alice Oliver–Parrott, Houston, for Appellants.

D. Mitchell McFarland, James E. Essig, Houston, Dale Hausman, Washington, DC, Robert Barron Boemer, Houston, for Appellees.

Panel consists of Justices COHEN, NUCHIA, and DUGGAN.*

## OPINION

LEE DUGGAN, Jr., Justice (Retired).

The principal question in this appeal from a summary judgment is as follows: for purposes of coverage under an occurrence-based comprehensive general liability ("CGL") insurance policy, do personal injury and property damage from underground contamination "occur" under Texas law only when the harm is "discovered"? We answer in the negative.

Eleven plaintiffs filed seven suits[1] in 1996 against Pilgrim Enterprises, Inc. and related entities[2] (collectively, "Pilgrim") for personal injuries and property damage allegedly caused by long term exposure to a chemical known as perchloroethylene ("PCE") and other hazardous substances released from Pilgrim's facilities. Each suit was filed by a former Pilgrim landlord or adjacent property owner. Pilgrim filed three coverage lawsuits, later consolidated by agreement into one case, against Maryland Casualty Co. ("Maryland") and other insurers, seeking a defense and indemnification. Maryland filed a motion for partial summary judgment, asserting that it had no duty to defend Pilgrim in five of the seven pending suits. The trial court granted the partial summary judgment in favor of Maryland and, over Maryland's objection, severed the judgment to allow Pilgrim to commence an immediate appeal.

Maryland appeals the trial court's action in granting the severance; Pilgrim appeals the summary judgment holding that Maryland has no duty to defend the five suits.

We affirm that portion of the trial court's judgment severing the cause; we reverse the remaining portion of the judgment, which rendered summary judgment on the ground that Maryland had no duty to defend, and remand the cause.

## I.

### Factual Background

Pilgrim has operated dry cleaning facilities in Harris and Bexar counties since the 1960s. In the course of its operations, Pilgrim purchased CGL insurance policies from various insurers, including four consecutive policies from Maryland between December 1981 and December 1985.

Over the years, Pilgrim used PCE as the primary solvent in its dry cleaning operations. In 1994, Pilgrim conducted soil sampling at 17 of its dry cleaning sites and discovered PCE contamination in the soil and, in some cases, the groundwater. The contamination allegedly arose from

---

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. The seven lawsuits are as follows: in 127th District Court, Harris County, Texas—*Turk v. Pilgrim Enterprises, Inc.*, Cause No. 06–38291; *Turk (II) v. Pilgrim Enterprises, Inc.*, Cause No. 96–38290; *Turk (III) v. Pilgrim Enterprises, Inc.*, Cause No. 96–38289. In the Southern District of Texas—*Sunblossom v. Pilgrim Enterprises, Inc.*, C.A. No. H–96–0405; *Briargrove Shopping Center J.V. v. Pilgrim Enterprises, Inc.*, C.A. No. H–96–724. In the 113th District Court, Harris, County, Texas—*Murad v. Pilgrim Enterprises, Inc.*, Cause No. 96–021802. In the 190th District Court, Harris County, Texas—*Agim v. Pilgrim Enterprises, Inc.*, Cause No. 96–53714.

2. The other entities are Pilgrim Convenience, Inc.; R & G No. 1, Inc.; R & G No. 2, Inc.; R & G No. 3, Inc.; Pilgrim Laundry Company, Inc.; Pilgrim Equipment Co., Inc.; R.F.S., Inc. No. 8; R.F.S., Inc. No. 11; R.F.S., Inc. No. 17; S & R No. 2, L.T.D.; and PLC No. 11 Joint Venture.

repeated spills, overfills, and leakage when Pilgrim's suppliers delivered PCE and during Pilgrim's maintenance and operation of its PCE storage units and dry cleaning equipment. Pilgrim notified the Texas Natural Resources Conservation Commission ("TNRCC") of the contamination and agreed with the TNRCC to clean up the contaminated sites in 1995.

In 1996, the seven suits against Pilgrim were filed. Pilgrim notified Maryland and requested a defense and indemnity under the 1981–85 policies. Maryland initially agreed to defend each suit, subject to a reservation of its right to withdraw from the defense and assert its coverage defenses. When Pilgrim made similar demands on its other insurers, and none agreed to defend or participate in funding Pilgrim's defense, Maryland withdrew its offer of complete defense. Pilgrim rejected Maryland's offer to pay only a "pro-rata" share of the defense costs.

After Pilgrim's coverage lawsuits against Maryland and its other insurers were consolidated, Maryland filed a motion for partial summary judgment on the ground that it had no duty to defend Pilgrim in five of the seven pending PCE lawsuits—*Sunblossom, Briargrove, Murad, Turk III,* and *Agim.* Maryland conceded its duty to defend in two suits, *Turk I* and *Turk II,* but asserted in its motion that the plaintiffs' claimed injuries in the five suits were not alleged to have occurred within the coverage period of Pilgrim's Maryland policies.

Maryland argued that the language of each policy triggered its duty to defend Pilgrim only if the alleged property damage or bodily injury became "manifest" during a policy period and that the tort plaintiffs' claims did not allege that. The trial court agreed, granted Maryland's motion for summary judgment on the five claims, and severed them from Pilgrim's remaining actions, specifically reciting that "[t]he Court's Partial Judgment is hereby made final so that Plaintiffs may commerce an immediate appeal."

## II.

### Maryland's appeal of the severance

Maryland argues in its point of error that the trial court abused its discretion in severing the five claims because they are inextricably interwoven (1) with the remaining claims Maryland must defend and (2) with the defenses of the twelve remaining defendant insurers. Further, Maryland argues, because the severance was improper, the partial summary judgment is not an appealable final judgment. Because Maryland's point of error would be dispositive of the entire appeal, if sustained, we address it first.

### A. Whether the severance order separated claims that are inextricably interwoven with remaining claims

 A partial summary judgment becomes final and appealable when the trial court signs an order severing into a separate case the parties and claims addressed. *Mafrige v. Ross,* 866 S.W.2d 590, 592 (Tex. 1993). Texas Rule of Civil Procedure 41 provides that "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41. A trial court has broad discretion in the matter of severance and consolidation of causes. *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex.1990). The standard of review for determining whether a trial court erred in ordering a severance is abuse of discretion. *Id.*

 The reasons undergirding a proper grant of severance "are to do justice, avoid prejudice and further convenience." *Id.* Severance is proper if

1. the controversy involves more than one cause of action;

2. the severed claim is one that would be the proper subject of a lawsuit if independently asserted; and

3. the severed claim is not so interwoven with the remaining action that

they involve the same facts and issues.

*Id.*

■ Here, Maryland claims the third element of this test is not met because (1) Pilgrim's claim against Maryland for a defense in the two remaining lawsuits involves the same facts and issues as in the severed actions; (2) Maryland's other defenses to coverage (such as a pollution exclusion clause) apply equally to its duty to defend here; and (3) other defendant insurers in the consolidated case have the same policy language defining when an injury occurs.

Maryland's duty to defend each severed and each remaining claim is a contractual undertaking defined by each policy. *See Whatley v. City of Dallas,* 758 S.W.2d 301, 304 (Tex.App.—Dallas 1988, writ denied). The specific language of each policy and the factual allegations of each underlying plaintiffs' pleadings against Pilgrim will determine Maryland's duty to defend each claim. *Nationwide Property & Cas. Ins. Co. v. McFarland,* 887 S.W.2d 487, 492 (Tex.App.—Dallas 1994, writ denied).

■ Similarly, Maryland's indemnity obligations on the severed claims are not inextricably interwoven with the remaining claims because the duties to defend and to indemnify in both the severed and remaining claims are separate duties. *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 821–22 (Tex.1997). Unlike the duty to defend, the duty to indemnify is based on facts proven, not on pleadings. *American Alliance Ins. Co. v. Frito–Lay, Inc.,* 788 S.W.2d 152, 154 (Tex.App.—Dallas 1990, writ dism'd).

We hold that the five severed claims are not inextricably interwoven with Pilgrim's remaining claims.

**B. Whether a severance order is proper if it severs some, but not all, claims against a particular defendant**

■ Maryland argues that a severance of some but not all claims against a party cannot form a final judgment for purposes of appeal, citing *Martinez v. Humble Sand & Gravel, Inc.,* 875 S.W.2d 311, 312 (Tex. 1994), *Guidry v. National Freight, Inc.,* 944 S.W.2d 807, 812 (Tex.App.—Austin 1997, no writ), and *Rutherford v. Whataburger, Inc.,* 601 S.W.2d 441, 443 (Tex. App.—Dallas 1980, writ ref'd, n.r.e.). None of these cases, however, holds that severance is *never* proper unless all claims against a particular defendant are released.

■ Maryland argues that the controlling reasons for a severance, "to do justice, avoid prejudice and further convenience," [3] apply only when all of the claims against a party are severed. However, it cites no case expressly so holding. In fact, the Texas Supreme Court has noted that severance is proper to set out a final judgment for appeal precisely when all issues against a defendant have not been disposed of. In *City of Beaumont v. Guillory,* the Court noted as follows:

> A summary judgment ... is presumed to dispose of only those issues expressly presented, not all issues in the case. *A summary judgment that fails to dispose expressly of all parties and issues in the pending suit is interlocutory and not appealable unless a severance of that phase of the case is ordered by the trial court....*

751 S.W.2d 491, 492 (Tex.1988) (emphasis added). As this highlighted language emphasizes, a severance is a proper means of rendering an otherwise interlocutory appeal final when some parties *and issues* still remain. Otherwise, the language above would simply refer to "all parties in the pending suit," not "all parties and issues."

■ The mere fact that some issues or claims remain against a defendant does not render a severance *invalid per se.*

3. *Guaranty Fed. Sav. Bank,* 793 S.W.2d at 658.

## C. Whether this court possesses jurisdiction to consider the appeal

 Maryland argues that, even if the trial court's severance order was not an abuse of discretion, Pilgrim's appeal is interlocutory and this court is, therefore, without jurisdiction to consider the appeal. We disagree. "[A]n improper severance does not rob [the] court of jurisdiction to consider a case; otherwise [the court] could not consider whether the severance itself was in fact improper." *Nicor Exploration Co. v. Florida Gas Transmission Co.*, 911 S.W.2d 479, 482 (Tex.App.—Corpus Christi 1995, writ denied).

We hold that the trial court did not abuse its discretion in severing the five defense coverage claims from Pilgrim's remaining claims. We overrule Maryland's point of error and proceed to the merits of Pilgrim's appeal.

## III.

## Pilgrim's appeal of the summary judgment

The policies provide coverage for alleged injury or damage "which occurs" during the policy period. Maryland urged in its motion for summary judgment, and the trial court agreed, that the term "which occurs during the policy period" means that coverage is triggered only when the injury or damage is *discovered*, or *manifest*, within the policy period. Pilgrim responded that coverage is triggered when harm is sustained from exposure to continuous pollution, even if it remains undiscovered until after the policy period. Because the policies define a covered occurrence as "an accident, including continuous or repeated exposure to conditions," Pilgrim reasons that a harm "occurs" *if it happens within the policy period.*

Pilgrim asserts that when and how coverage is triggered for an occurrence, as defined, depends on the plain language of the policy; that these policies do not make coverage contingent upon the time the alleged injury or damage is discovered; that

the court's only role is to enforce the trigger as demanded by the policy's terms; and that by grafting the "discovery" requirement onto the unambiguous policy, the trial court judicially rewrote the policy and diminished Pilgrim's coverage. Pilgrim argues that the plaintiffs' factual allegations, fairly and reasonably construed, state causes of action potentially within Maryland's coverage periods, thus invoking Maryland's duty to defend, even if Maryland is ultimately not required to indemnify.

## A. Applying the "eight corners" rule

 Texas courts apply the "eight corners" rule to determine whether an insurer has the duty to defend an insured, comparing the plaintiff's pleading allegations to the insurance contract provisions without regard to the facts that develop during discovery and trial. *See National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997).

 Unlike the duty to indemnify, the duty to defend arises when the plaintiff alleges facts that *potentially* support claims for which there is coverage. *Id.* The duty to defend is determined from the face of the pleading, without regard to the ultimate truth or falsity of the allegations. *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973). In determining the duty to defend, we construe the plaintiff's allegations against the insured liberally, "resolving any doubt in favor of the insured," though without reading facts into the pleadings for that purpose. *Cowan*, 945 S.W.2d at 825.

### 1. The tort plaintiffs' pleadings

To apply the eight corners rule, we examine the plaintiffs' pleadings in the five severed causes of action for those portions pertaining to the chronology of the alleged occurrences. The *Sunblossom* suit, filed by the owner of an apartment complex where a Pilgrim facility was located, alleg-

es that (1) Pilgrim operated a dry cleaning business at the complex since 1978; (2) Pilgrim discovered in 1995 that its business had contaminated the subsurface of the property; and (3) the plaintiff suffered property damages and costs from this contamination.

The *Briargrove* suit, filed by the owner of a shopping center at which Pilgrim operated a business, alleges that (1) Pilgrim operated a dry cleaning service business at the shopping center "from 1960 until 1979 or 1980"; (2) Pilgrim "permitted or caused hazardous substances to seep or leak," damaging the plaintiff's property; and (3) the plaintiff discovered the contaminants and, in 1994, asked Pilgrim to pay for the costs associated with the contamination.

The *Murad* suit, filed by Dolares Murad, the owner of a home adjacent to a Pilgrim dry cleaning facility, alleges in the second amended original petition that (1) Pilgrim operated the business continuously since it was opened in "early 1985"; (2) Pilgrim allowed chemicals used in the dry cleaning operation to escape from the property and migrate beneath Ms. Murad's property; and (3) in addition to property damage, Ms. Murad was diagnosed with cancer as a result of the contamination.

The *Turk* lawsuits, filed by the owner of three shopping centers at which Pilgrim operated leased facilities, alleged that (1) Pilgrim operated a dry cleaning facility at the three locations from December 9, 1965 until at least 1990 for the first location and from November 24, 1964 and June 20, 1966, through the present, for the other two locations and (2) Pilgrim allowed PCE or other hazardous substances to enter the surface or subsurface of the premises, damaging the properties.

The *Agim* plaintiffs, who live near a Pilgrim dry cleaning facility, alleged that (1) Pilgrim owned and operated its dry cleaning facility "from December 1979 to the present"; (2) Pilgrim allowed PCE and other hazardous substances to migrate onto the plaintiffs' property; and (3) the

contamination physically injured the plaintiffs through chronic exposure and caused damage to the property.

## 2. The Maryland policies' coverage language

Under each of its four policies, Maryland agreed to pay all sums that Pilgrim "shall become legally obligated to pay ... because of ... bodily injury or ... property damage ... to which this insurance applies, caused by an *occurrence*." (Emphasis added).

> Each policy defines an "occurrence" as an accident, *including continuous or repeated exposure to conditions,* which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.

(Emphasis added.)

The policies define "bodily injury" and "property damage" as follows:

> "bodily injury" means bodily injury, sickness, or disease sustained by any person *which occurs during the policy period,* including death at any time resulting therefrom....

> "property damage" means (1) physical injury to or. destruction of tangible property *which occurs during the policy period,* including the loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is *caused by an occurrence during the policy period.*

(Emphasis added.)

The policies also give Maryland "the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage."

## B. Must an "occurrence" be discovered within a policy period to trigger coverage?

█ Maryland argued in its summary judgment motion that the definitions of "occurrence," "bodily injury," and "proper-

ty damage," when read together, trigger its duty to defend Pilgrim only if the alleged property damage or bodily injury is "manifest" during the policy period and that the pleadings fail to allege a manifestation of harm within any policy period. The trial court agreed and granted Maryland's motion.

Pilgrim responds that the tort plaintiffs' pleadings allege that property damage and physical injury were caused by pollution from Pilgrim facilities and that Pilgrim operated the respective premises during time periods overlapping with some or all of Maryland's policies. Pilgrim argues that the allegations at least potentially allege physical or property damage occurring during the policy period.

Maryland argues that Texas case law has "consistently interpreted" similar policies to require a "manifestation trigger," citing *Dorchester Development Corp. v. Safeco Insurance Co.*, 737 S.W.2d 380, 383 (Tex.App.—Dallas 1987, no writ). Our review of Texas law indicates the issue is far from settled.

In *American Physicians Insurance Exchange v. Garcia*, the Texas Supreme Court declined to adopt a specific test for an "occurrence" for insurance policies. *See* 876 S.W.2d 842, 853 n. 20 (Tex.1994). Surveying the law of other jurisdictions, the Court noted at least five tests for when a harm occurs to trigger coverage under an insurance policy:

1. the "pure" or "strict" manifestation rule—"triggers coverage upon actual discovery of injury";

2. the "relaxed" manifestation rule—"triggers coverage in first policy period during which discovery of injury is possible";

3. the "exposure" rule—"triggers coverage in any policy period in which exposure to cause of injury occurred";

4. the "injury-in-fact" rule—"sets trigger in personal injury cases at point

when body's defenses are 'overwhelmed' "; and

5. the "multiple" or "triple-trigger" rule—"requires coverage under all policies during period of continuing exposure and manifestation."

*Id.* (citations omitted). After noting *Dorchester* as limited Texas precedent for the "pure manifestation" approach, the Texas Supreme Court specifically declined "to select among these tests, or formulate [the Court's] own," because the outcome of *American Physicians* did not require resolution of the issue. *Id.*

Our research indicates only three Texas appellate decisions have addressed when harm occurs under an insurance policy. In *Dorchester*, a 1987 construction defect case, the Dallas Court of Appeals noted the lack of Texas authority and adopted the reasoning of Florida and Idaho decisions with identical policy provisions. 737 S.W.2d at 383. Summarizing these decisions, the *Dorchester* court opined that "no liability exists on the part of the insurer unless the property damage manifests itself, or becomes apparent, during the policy period." *Id.* (discussing *Travelers Ins. Co. v. C.J. Gayfer's and Co., Inc.*, 366 So.2d 1199 (Fla.Dist.Ct.App.1979), and *Millers Mut. Fire Ins. Co. v. Bailey, Inc.*, 103 Idaho 377, 647 P.2d 1249 (1982)). Based on the *Dorchester* plaintiff's admission that damages were *not* manifested during the policy period, the court held that there was no "occurrence" during the policy period. 737 S.W.2d at 383. Though *Dorchester*'s reasoning is not explicit, it equated "occurrence" with "manifestation" of harm and denied coverage to the insured.

In its second decision predating *American Physicians*, the Dallas Court of Appeals cited its prior *Dorchester* decision for the proposition that "coverage is not afforded unless an *identifiable* damage or injury, other than merely causative negligence, takes place during the policy period." *Cullen/Frost Bank v. Commonwealth Lloyd's, Ins. Co.*, 852 S.W.2d 252, 257 (Tex.

App.—Dallas 1993, writ denied) (emphasis added). By focusing on when harm is identifiable, rather than actually discovered, *Cullen/Frost* indicates the Dallas court takes a "relaxed" manifestation approach. The court ruled for the insured and held there was coverage.

Finally, the Austin Court of Appeals cited *Cullen/Frost* for the proposition that "property loss occurs when the injury or damage is manifested." *State Farm Mut. Auto. Ins. Co. v. Kelly*, 945 S.W.2d 905, 910 (Tex.App.—Austin 1997, writ denied). However, this observation is arguably *dicta*. Kelly was the good faith purchaser of a stolen automobile. The *Kelly* court refused to follow cited out-of-state authorities holding that the loss occurred "when the insured acquired the bad title, *i.e.*, at the time of purchase, a period not covered by the policy." *Id.* In rejecting this authority, the Austin court stated as its first reason that it "decline[d] to follow this rationale because of the long-standing Texas precedent that ownership is not required for an insurable interest in this state." *Id.* As a *further* reason for its decision, the *Kelly* court wrote as follows:

> *Additionally,* Texas courts have held that property loss occurs when the injury is manifested. *See Cullen/Frost Bank v. Commonwealth Lloyd's*, 852 S.W.2d 252, 258 (Tex.App.—Dallas 1993, writ denied). Mr. Kelly's loss only became evident at the time his car was confiscated, not when he received bad title.

945 S.W.2d at 910 (emphasis added). The court ruled for the insured and held there was coverage.

In short, the case law governing when harm occurs under CGL policies is far from settled. The Texas Supreme Court has declined to adopt any test or fashion its own, the Dallas Court of Appeals has

adopted a "relaxed" manifestation rule,[4] the Austin Court of Appeals has arguably adopted the Dallas court's approach, and other appellate courts have not yet addressed the subject. Furthermore, no Texas appellate court has addressed what test should be used to determine when harm occurs in toxic tort suits involving CGL policies that specifically include "continuous or repeated exposure to conditions" within the definition of an "occurrence."

The Fifth Circuit Court of Appeals, in its most recent survey of Texas insurance law on the meaning of "occurrence," concluded that its "best *Erie* guess as to what Texas would choose as the event that triggers the insurer's duty to defend in asbestos personal injury cases under a uniform CGL policy is the exposure theory"—*i.e.*, that coverage is triggered in any policy period in which exposure to the cause of the harm occurred. *Guaranty Nat'l Ins. Co. v. Azrock Indus., Inc.*, 211 F.3d 239, 251–52 (5th Cir.2000). Although the trial court in *Azrock* defined "injury" as "the date an asbestos-related condition or disease manifests or becomes identifiable," the Fifth Circuit Court of Appeals instead defined "injury" as "the subclinical tissue damage that occurs on inhalation of asbestos fibers." *Id.* at 244. Applying this "exposure" theory to the personal injury claims, the *Azrock* court remanded to the trial court to determine which of the personal injury suits, if any, alleged exposure to the defendant's asbestos-containing products during the relevant policy periods. *Id.* The *Azrock* court acknowledged that older Fifth Circuit cases had used the manifestation rule for property damage cases, however, and affirmed the trial court's application of the manifestation rule to the one underlying complaint alleg-

---

**4.** Though *American Physicians* described *Dorchester* as "explaining" a "pure" manifestation approach, the *Dorchester* court never explicitly distinguished whether it was adopting a "pure" or "relaxed" manifestation rule.

The later opinion, *Cullen/Frost*, effectively clarified its approach as "relaxed" manifestation when the court focused on whether the harm was "identifiable."

ing property damage. *Id.* at 246–48.[5]

Because the Texas Supreme Court in *American Physicians* expressly declined either to adopt any of the tests enumerated within the opinion or to fashion a new test, we are not bound by any of the theories discussed above in analyzing the meaning of an occurrence under the Maryland policies.

Maryland urges us to apply the "pure" manifestation rule, while Pilgrim argues that an injury "occurs" under the policy when damage is actually sustained through exposure, not when it is later discovered.[6]

In an occurrence-based policy, the insured is covered for "all claims based on an event occurring during the policy period, regardless of whether the claim or occurrence is brought to the attention of the insured or made known to the insurer during the policy period." *Yancey v. Floyd West & Co.,* 755 S.W.2d 914, 918 (Tex.App.—Fort Worth 1988, writ denied). In contrast, a claims-made policy covers only injuries or damages that come to the attention of the insured and are made known to the insurer during the policy period. *Id.* Thus, a claims-made policy, which contemplates a fixed termination point, is less expensive than an occurrence-based policy, for which the insurer may have difficulty calculating premiums based on the costs of the insured risks. *Id.* at 923 (discussing the economic distinctions between "occurrence-based" and "claims-based" policies).

Pilgrim points out that the language of the Maryland policies is occurrence-based, contemplating comprehensive (and correspondingly more expensive) coverage, and argues that the court would drastically and retroactively reduce the value of the Maryland policies if it reads into the policies a "claims-based" requirement that the injury must actually be discovered within the policy period. We agree.

The Maryland policies in question neither use the word "manifest" nor state that injury or damage must be identified within the policies' time period. Each policy's definition of "occurrence" contemplates that covered injury or damage can arise from accidents of "continuous or repeated exposure" to chemicals, and each policy defines "bodily injury" or "property damage" as "bodily injury, sickness, or disease" or "physical injury to or destruction of tangible property" occurring during the policy period. Thus, the policies contemplate that harm caused by continuous exposure during a policy period will be covered by that policy.

We agree with the *Azrock* decision that, for CGL policies covering continuous or repeated exposure to conditions, injury can occur as the exposure takes place. Ultimate complications from sustained exposure, on the other hand, would tend to define the scope of damages. We do not find it necessary to limit the exposure rule to physical injury, however. *Azrock* was constrained to follow Fifth Circuit precedent on property damage; we are faced with an issue of first impression. We find

---

**5.** In *Snug Harbor, Ltd. v. Zurich Insurance,* the Fifth Circuit Court of Appeals determined that an "occurrence" takes place under Texas law when the injured party suffers damage, rather than at the time of the negligent act or omission causing the damage. 968 F.2d 538, 544 (5th Cir.1992). In *American Home Assurance Co. v. Unitramp Ltd.,* the Fifth Circuit of Appeals opined that, under Texas law, property damage occurs within the meaning of a CGL policy when the damage becomes manifest. 146 F.3d 311, 313 (5th Cir.1998). The court reasoned that "identifiable" is "synonymous with 'manifest' and 'apparent,'" which each mean "'capable of easy perception.'"

*Id.* at 314 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 102 (1986)).

**6.** Maryland does not expressly use the term "pure" or "strict" manifestation in its argument. However, it essentially adopts that approach by arguing that the harm became manifest only after Pilgrim's testing revealed the harm, even if the contamination was capable of being determined from testing at an earlier point. Pilgrim's argument would fall within the "exposure" rule approach, though Pilgrim does not expressly use the term.

the Maryland policies' language, which defines an occurrence as harm caused by continuous or repeated exposure, transforms allegations of both physical injury *and* property damage caused by exposure to PCE during the policy periods into covered events.

Under well settled principles of insurance policy construction, "in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in [the] insured's favor." *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d 22, 26 (Tex.1965). Thus, an insurer's duty to defend arises if the factual allegations against the insured, when fairly and reasonably construed, state a cause of action potentially covered by the policy. *National Union,* 939 S.W.2d at 141.

At summary judgment, Maryland had the burden of proving that one of the policy's limitations or exclusions constituted an avoidance or affirmative defense. TEX. INS. CODE ANN. art 21.58(b) (Vernon Supp.2000). Maryland established only that Pilgrim and the plaintiffs were first alerted to the existence of chemical contamination after the Maryland policies had expired. In each of the severed tort lawsuits, however, the plaintiffs alleged that Pilgrim released PCE and other chemicals from its facilities and that this contamination continuously exposed property, and in some cases individuals, to the chemicals. In each case, the plaintiffs seek damages for this exposure.

 The *Sunblossom, Turk,* and *Agim* lawsuits allege that Pilgrim operated its facilities before, during, and after the Maryland policy periods. *Murad* alleges that Pilgrim began to operate its facility in early 1985, during and after Maryland's

final policy period. *Briargrove,* however, alleges that Pilgrim ceased operating its facility in 1979 or 1980, before the effective date of any of the Maryland policies.

*Briargrove*'s pleadings, therefore, require us to determine whether the triggering event under the exposure rule is the *release* of contaminants or the *exposure* to those contaminants. If the trigger is Pilgrim's initial or ongoing *release* of PCE or other harmful chemicals, then the *Briargrove* lawsuit would not be covered by any of Maryland's policies; if the trigger is the *exposure* to the chemicals, then *Briargrove*'s pleadings potentially allege ongoing exposure to contaminants during some or all of the policy periods.

In *E & L Chipping Co., Inc. v. Hanover Insurance Co.,* the insured's woodchip pile caught fire. 962 S.W.2d 272, 275 (Tex. App.—Beaumont 1998, no pet.). The plaintiffs, surrounding landowners, alleged that the insured's attempt to extinguish the fire by spraying large quantities of water caused a runoff of contaminated water that polluted their downstream properties. *Id.* The insurance policy in question defined an occurrence as " 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.' " *Id.* The pleadings, however, alleged that, while the fire began before the policy period, ongoing damage from exposure to the resulting runoff continued into the policy period. *Id.* The court found that the policy did not require that the "occurrence" (the accident initially giving rise to the exposure) take place within the policy period. *Id.* However, because runoff *resulted* in contamination during the policy period, the court found a duty to defend even though the occurrence (the fire and its extinction) took place before the policy period. *Id.*[7]

Although *E & L Chipping* did not adopt a particular test for the triggering of cov-

---

7. The court found the fire occurred before the policy period. *Id.* Though it was unclear whether the extinction of the fire extended into the policy period, the court found the

pleadings alleged that contamination from runoff continued through the policy period. *Id.*

erage, its analysis is consistent with an exposure approach. Here, the Maryland policies do not define an occurrence as an event happening *within* a policy period, but as "an accident, including continuous or repeated exposure to conditions, which *results* in bodily injury or property damage." (Emphasis added.) The policies' time restriction is found in the definitions of "bodily injury" or "property damage," which require the *harm* to occur during the policy period. Following *E & L Chipping*, we find that the policies cover physical injury or property damage caused by exposure occurring during the policy periods, even if the contamination began before the policy periods. All five of the lawsuits allege continuous exposure to contaminants released by Pilgrim that seeped or leaked into the surrounding property. Potentially, at least, all of the pleadings allege property damage occurring during the policy period because of ongoing contamination or seepage.

Though it is possible to argue, from the pleadings, that the exposure occurred outside policy periods, the pleadings also support a claim for exposure occurring during policy periods. Because the pleadings potentially allege exposure during the policy periods and damages for this exposure, we conclude that Maryland owes Pilgrim a duty of defense, even if it should later become apparent that the contamination of which the plaintiffs complain occurred at a later point. *See, e.g., Texas Property & Cas. Ins. Guar. Ass'n v. Southwest Aggregates, Inc.*, 982 S.W.2d 600, 604 (Tex. App.—Austin 1998, no pet.) (noting that "[t]he duty to defend is not affected by facts ascertained before suit, developed in the process of the litigation, or by the ultimate outcome of the suit") (citing *Maupin*, 500 S.W.2d at 635).

## IV.

### Whether Maryland's defense costs should be allocated

Pilgrim also challenges the alternative argument in Maryland's motion for partial summary judgment that, if Maryland should owe a duty to defend, the court should allocate the cost of Pilgrim's defense among the various insurance carriers and Pilgrim. The trial court expressly granted, severed, and made final its summary judgment solely on the ground of Maryland's duty to defend. Accordingly, we do not address the merits of the alternative argument in this appeal. *See Delaney v. University of Houston*, 835 S.W.2d 56, 58 (Tex.1992) (declining to address legal arguments on which the district court did not base summary judgment).

## V.

### Conclusion

We affirm that portion of the trial court's judgment severing the cause. Because exposure to PCE or other chemicals from Pilgrim's site could potentially have fallen within the Maryland policy periods under the tort plaintiffs' allegations, we reverse the remaining portion of the judgment, which rendered summary judgment on the ground that Maryland had no duty to defend, and remand the cause.