Affirmed and Opinion filed February 5, 2009








Affirmed and Opinion filed February 5, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00889-CV

____________

 

SOLVENT UNDERWRITERS SUBSCRIBING TO
ENERGY INSURANCE INTERNATIONAL, INC. COVER NOTE NO. EII-3824 AND SOLVENT
UNDERWRITERS SUBSCRIBING TO ENERGY INSURANCE INTERNATIONAL, INC. COVER NOTE NO.
EII-3825,
Appellants

 

V.

 

FURMANITE AMERICA, INC., Appellee

 



 

On Appeal from the 152nd
District Court

Harris County, Texas

Trial Court Cause No. 2003-62306

 



 

O P I N I O N








This
summary judgment case involves an insurance-coverage dispute under a commercial
general liability policy.  Appellants, Solvent Underwriters Subscribing to
Energy Insurance International, Inc. Cover Note No. EII-3824 (AUnderwriters EII-3824@) and Solvent Underwriters
Subscribing to Energy Insurance International, Inc. Cover Note No. EII-3825 (AUnderwriters EII-3825@) (collectively AUnderwriters@), challenge the trial court=s judgment that determined
Underwriters had a duty to defend appellee, Furmanite America, Inc. (AFurmanite@), in a Louisiana toxic tort lawsuit.


In three
issues, Underwriters contend that the trial court erred by: (1) denying its
summary judgment motion and granting Furmanite=s motion because (a) under the
Operations Buyback Endorsement, the underlying claim was not made during the
policy period and (b) under the Pollution Buyback Endorsement, Furmanite did
not fully comply with all notice conditions required to trigger coverage; and
(2) considering parol evidence to determine coverage. We affirm.

I. 
BACKGROUND

Furmanite
is a corporation that contracts with refineries and chemical plants to contain
hazardous materials.  Furmanite=s core service is on-line and under pressure leak sealing,
which is the process of stopping the escape of potentially hazardous liquids or
gas from plant equipment while the plant remains on-line and operating.  

A. 
Insurance Policy in Question

In 1993,
Furmanite sought comprehensive general liability insurance through its parent
company, Kaneb Services, Inc. (AKaneb@), and on August 26, 1993, Underwriters EII-3824 issued to
Kaneb and its subsidiaries, which included Furmanite, a primary comprehensive
general liability insurance policy (APrimary Policy@).  Underwriters EII-3825 issued an
excess liability insurance policy (AExcess Policy@) to Furmanite as well.  The parties
agree that on the issues relevant to this case, the terms in the Primary and
Excess policies are identical.  Accordingly, the Primary Policy and Excess
Policy are collectively referred to as Athe Policy.@  The Policy states: 

The
Underwriters will pay on behalf of the Insured all sums which the Insured shall
become legally obligated to pay as damages because of

A.  bodily injury or

B.  property damage








to which
this insurance applies, caused by an occurrence and the Underwriters shall have
the right and duty to defend any suit against the insured seeking damages on
account of such bodily injury or property damage, even if any of the
allegations of the suit are groundless, false, or fraudulent . . . .@

 

1. Pollution
Exclusion

The
Policy was later amended to include an oil, seepage, and pollution exclusion. 
Specifically, Endorsement No. 5, titled AThird Party Oil Exclusions - AOccurrence@ (APollution Exclusion@), provides in part: 

Notwithstanding
anything to the contrary contained in this policy, it is hereby understood and
agreed that this policy is subject to the following exclusions and this policy
shall not apply to:

.             .             .

Liability for any bodily and/or personal injury to or
illness or death of any person or loss of, damage to, or loss of use of
property directly or indirectly caused by or arising out of seepage into or
onto and/or pollution and/or contamination of air, land, water, and/or any
other property and/or any person irrespective of the cause of the seepage
and/or pollution and/or contamination, and whenever occurring.  

2.  Operations Buyback Endorsement

 

The
Policy is also subject to various buyback endorsements; two that are relevant
to this case are endorsements 7 and 8.  Endorsement 7 is titled AProducts Liability/Completed
Operations Claims Made Endorsement@ (AOperations Buyback Endorsement@).  It provides in part:

It is
understood and agreed to indemnify the Assured in respect of damages arising
out of the Products Liability/Completed Operations hazard, whether imposed by
law or assumed under contract, in respect of any claim which is first made in
writing against the Assured during the policy period and which arises solely by
reason of:

a)         Bodily Injury/Personal Injury

b)         Property Damage








resulting
from an accident.

If Underwriters receive written notification from the
Assured during the policy period and up to sixty months thereafter, of an
Accident which first commences prior to the expiry of the policy period, then
Underwriters will treat all claims arising out of the notified Accident made
against the Assured within 60 months from the date of such notification as made
on the date on which the notification was received by Underwriters of the
expiry of the policy, whichever is earlier.

3.  Pollution
Buyback Endorsement

The
second relevant buyback endorsement, Endorsement 8, is titled ASudden and Accidental Seepage and
Pollution Buyback Endorsement@ (APollution Buyback Endorsement@) and provides in part:

Notwithstanding
the [Pollution Exclusion] . . . coverage . . . will apply to . . . personal
injury or bodily injury or loss of, damage to or loss to use of property . . .
caused by seepage and pollution . . . or contamination of air. . . .

.         .        .

Provided
that . . . the following conditions have been met:

(a)       . . . the loss is accidental . . . 

(b)       the loss became known to the Assured within 7 days after its
commencement . . .

(c)       the loss was reported in
writing to these Underwriters within 14 days after having become known to the
Assured . . . .   

B. 
Underlying Lawsuit








On July
28, 2003, Furmanite was named as a defendant in a Louisiana toxic tort
lawsuit.  The Louisiana suit was filed by Patrick Baughn, a former BP engineer
at the Alliance Refinery in Louisiana.  Baughn alleged in his petition that
during his employment with BP, between 1992 and 1999, he was continually
exposed to toxic airborne chemicals including benzene, hydroflouric acid, and
hydrocarbons.  Baughn alleged that Furmanite, while operating as a fugitive
emissions contractor at the Alliance Refinery, failed to (1) Aproperly monitor and report fugitive
emissions of toxic substances to which [Baughn] was exposed and from which
injury was sustained,@ (2) Awarn [Baughn] of the existence and occurrence of the releases
of toxic substances@ and Athe location in the refinery where toxic releases occurred,@and (3) Asound the safety alarm upon the
occurrence of toxic releases.@              On August 5, 2003, four days after Furmanite
was served with Baughn=s petition, Furmanite demanded a defense and indemnification
from Underwriters in accordance with the terms of the Policy.  Underwriters
denied that they had the duty to defend or indemnify Furmanite. 

C.  Trial Court Proceedings

After
denying a duty to defend, Underwriters filed this action, seeking a declaration
that the Policy did not insure Furmanite against their potential liability in
the Baughn lawsuit and therefore owed no duty to defend or indemnify
Furmanite.  Furmanite answered with counterclaims alleging breach of contract
and violations under article 21.21 of the Texas Insurance Code.  Furmanite also
sought a declaration from the trial court that some or all of the claims
asserted in the Baughn lawsuit were covered under the Policy.  

            Underwriters
moved for summary judgment asserting that there was no coverage under the
Policy giving rise to a duty to defend or indemnify.  Furmanite responded with
a partial summary judgment motion, urging the trial court to dismiss Underwriters= request for a declaratory judgment. 
Relying on the Pollution and Operations buyback endorsements, Furmanite argued
that the Policy provided coverage, thereby requiring Underwriters to defend and
indemnify Furmanite in the Baughn lawsuit.  On September 7, 2006, the
trial court denied Underwriters= motion for summary judgment, granted Furmanite=s partial summary judgment motion,
and declared that Furmanite was entitled to a defense in the Baughn lawsuit.









Furmanite
then sought a second summary judgment on its counterclaim for breach of
contract and attorney=s fees.  On June 29, 2007, the trial court granted Furmanite=s subsequent motion for summary
judgment and awarded Furmanite attorney=s fees.  On September 13, 2007, the
trial court reformed the judgment to reflect the appropriate allocation of
attorney=s fees based on the subscribed
percentages of those assuming the risk in the Policy.   

On
appeal, appellant argues that the trial court erred in: (1) denying its summary
judgment motion and granting Furmanite=s motion because (a) under the
Operations Buyback Endorsement, the underlying claim was not made during the
policy period and (b) under the Pollution Buyback Endorsement, Furmanite did
not fully comply with all notice conditions required to trigger coverage; and
(2) improperly considering parol evidence to determine coverage. 

II. 
STANDARD OF REVIEW

Declaratory
judgments decided by summary judgment are reviewed under the same standards of
review that govern summary judgments generally.  Tex. Civ. Prac. &
Rem. Code ' 37.010; Lidawi v. Progressive County Mut. Ins. Co., 112 S.W.3d
725, 730 (Tex. App.CHouston [14th Dist.] 2003, no pet.).  We review a summary
judgment de novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d
656, 661 (Tex. 2005).  Traditional summary judgment is proper only when the
movant establishes that there is no genuine issue of material fact and that the
movant is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Nixon
v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985).   In reviewing a
summary judgment, we must indulge every reasonable inference in favor of the
nonmovant, take all evidence favorable to the nonmovant as true, and resolve
any doubts in its favor.  Randall=s Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995).  
When, as here, a summary judgment does not specify the grounds on which it was
granted, we will affirm the judgment if any one of the theories advanced in the
motion is meritorious.  Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d
150, 157 (Tex. 2004).

 

 








III.  DUTY
TO DEFEND AND INDEMNIFY

Underwriters= first two issues challenge coverage
and the duty to defend or indemnify Furmanite in the Baughn lawsuit. 
Whether an insurance carrier owes a duty to defend under an insurance policy is
a question of law which the appellate court reviews de novo.  Koenig v. First
Am. Title Ins. Co. of Tex., 209 S.W.3d 870, 873 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  If a petition does not allege facts within the scope of
coverage, an insurer is not legally obligated to defend a suit against its
insured.  Nat=l Union Fire Ins. Co. of Pittsburgh,
Pa. v. Merchs. Fast Motor Lines, Inc., 939 S.W.2d 139, 141 (Tex. 1997).   Thus, the duty to defend is
determined by the allegations in the underlying pleadings and the language of
the insurance policy.  Id.  This standard is referred to as the Aeight corners@ rule or the Acomplaint-allegation@ rule.  See King v. Dallas Fire
Ins. Co., 85 S.W.3d 185, 187 (Tex. 2002).  Under the eight corners rule, a
liability insurer is obligated to defend the insured if the facts alleged in
the pleadings would give rise to any claim within the coverage of the policy
based on the policy terms.  Utica Nat=l Ins. Co. of Tex.
v. Am. Indem. Co., 141 S.W.3d 198, 201 (Tex. 2004).  We interpret the
allegations liberally in favor of the insured.  Zurich Am. Ins. Co. v.
Nokia, Inc., 268, S.W.3d 487, 491 (Tex. 2008).  Any doubt as to whether the
insurer has the duty to defend is resolved in favor of such duty.  King,
85 S.W.3d at 187.








The duty to defend is distinct from, and broader than, the
duty to indemnify.  Zurich, 268 S.W.3d at 490 (quoting 14 Lee R. Russ & Thomas F. Segalla, Couch on
Insurance ' 200:1 (3d ed. 2007)).  An insurer must
defend its insured if a plaintiff=s factual
allegations potentially support a covered claim, while the facts actually
established in the underlying suit determine whether the insurer must indemnify
its insured.  See GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church,
197 S.W.3d 305, 310 (Tex. 2006).  Unlike the duty to indemnify, whether there
is a duty to defend does not depend on the actual facts which might support
liability in the underlying suit.  Trinity Universal Ins. Co. v. Cowan,
945 S.W.2d 819, 821-22 (Tex. 1997).  An insurer may have a duty to defend but,
eventually, no obligation to indemnify.  Zurich, 268 S.W.3d at 490-91.  

A.  Construing the Pleadings in the Underlying Suit

We look first at the facts alleged in the Baughn
petition.  Baughn
alleged that during his employment with BP, between 1992 and 1999, he was
continually exposed to toxic airborne chemicals including benzene, hydroflouric
acid, and hydrocarbons.  Baughn specificially alleged that Furmanite, while
operating as a fugitive emissions contractor at the Alliance Refinery, failed
to (1) Aproperly monitor and report fugitive
emissions of toxic substances to which [Baughn] was exposed and from which
injury was sustained,@ (2) Awarn [Baughn] of the existence and occurrence of the releases
of toxic substances@ and Athe location in the refinery where toxic releases occurred,@and (3) Asound the safety alarm upon the
occurrence of toxic releases.@

B.  Construing the CGL Policy Terms

We look next to the policy language at issue in this case. 
The Policy initially
covers damages resulting from Abodily injury . . . caused by an occurrence.@  An occurrence is defined in the
Policy as Aan accident, including continuous or repeated exposure to conditions,
which results in bodily injury or property damage . . . .@  The Pollution Exclusion, however,
eliminates Aliability for any bodily . . . or personal injury . . . arising out of
seepage into or . . . pollution . . . or contamination of air. . . .@  

Thus, there is no coverage under the Policy for Baughn=s claim based on
the Pollution Exclusion except to the extent that coverage is restored by the
Pollution or Operations buyback endorsements.  Accordingly, we need to construe
only these two buyback endorsements and determine whether the terms of either
endorsement provides coverage for the injuries asserted in the Baughn
lawsuit.  

 








C.  Construing and Applying the Operations Buyback
Endorsement With the Pleadings

The
Operations Buyback Endorsement provides in part that Furmanite will be
indemnified for Adamages arising out of the Products/Liability/Completed
Operations hazard . . . of any claim . . . first made in writing against the
Assured during the policy period . . . arising . . . by reason of bodily injury
. . . [or] property damage . . . .@  The endorsement further requires
Furmanite to notify Underwriters of the claim within 60 months after the
covered accident commences.  Pursuant to the eight corners rule, we compare the
factual allegations in Baughn=s petition with the language of the
Operations Buyback Endorsement to determine coverage.  See Utica Nat=l, 141 S.W.3d at
201.  

Underwriters argue that there is no coverage under this
particular endorsement because Baughn=s claim was not
first made in writing during the policy period.  We agree.  The plain language
of the Operations Buyback Endorsement limits liability to those claims made
during the policy period.  The policy period was August 1993 through August
1994.  Because Baughn first made his claim outside of the policy period, in
2003, no coverage exists under this particular endorsement.  

Furmanite argues that the Policy does not require a claim
to be made during the policy period; it claims instead that it is the
occurrence of the physical injury rather than the making of the claim that must
take place during the policy period.  According to Furmanite, the Policy should
be interpreted as an occurrence-based policy, thus requiring that Baughn=s physical injury,
not his claim, occur during the policy period.  Construing the Policy as an
occurrence-based policy, Furmanite contends that the claim is covered  because
Baughn=s petition alleges
an injury between 1992 and 1999, a span of years that encompasses the policy
period.  Because the Operations Buyback Endorsement cannot be construed as an
occurrence-based provision, we reject this argument. 








Typically,
an occurrence-based policy covers all claims based on an event occurring during
the policy period, regardless of whether the claim or occurrence is brought to
the attention of the insured or made known to the insurer during the policy
period.  See Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 844
n.4 (Tex. 1994); Pilgrim Enters., Inc. v. Maryland Cas. Co., 24 S.W.3d
488, 496 (Tex. App.CHouston [1st Dist.] 2000, no pet.).  In contrast, a claims-made policy covers only
claims made during the policy period for injuries or occurrences within a
coverage period.  Garcia, 876 S.W.2d at 844 n.3; Pilgrim,
24 S.W.3d at 496. 

While Furmanite is correct that many provisions in the
Policy are occurrence-based, generally linking coverage to an occurrence or
accident, these occurrence-based provisions would not provide coverage in the
instant case.  Coverage does not exist in this case except to the extent that
the Operations or Pollution buyback Endorsements restore coverage.  Reviewing
first the Operations Buyback Endorsement, it is clearly a claims-made
provision.  Specifically, this paricular endorsement states that there is coverage Aof any claim . . .
first made in writing against the Assured during the policy
period . . . .@  Fumanite=s contention that the claim need not be
made during the policy period contradicts the plain language of this buyback
endorsement and therefore lacks merit.

The Operations Buyback Endorsement limits coverage to those
claims made between August 1993 and August 1994.  Baughn=s petition
reflects that his claim was made in 2003.  Applying the eight corners rule, the
Operations Buyback Endorsement does not cover the injury asserted in Baughn=s petition.   Thus,
the Operations Buyback Endorsement does not impose a duty to defend or
indemnify Furmanite in the underlying lawsuit.  We now look to the Pollution
Buyback Endorsement for  coverage.  

D.  Construing and Applying the Pollution Buyback
Endorsement With the Pleadings

The Pollution Buyback Endorsement provides in part:

coverage .
. . will apply to personal injury or bodily injury or loss of, damage to or
loss to use of property . . . caused by seepage and pollution . . . or
contamination of air . . . .

.         .        .








 

Provided
that . . . the following conditions have been met:

(a)       . . . the loss is accidental . . . 

(b)       the loss became known to the Assured within 7 days after its
commencement . . .

(c)       the loss was reported in
writing to these Underwriters within 14 days after having become known to the
Assured . . . .@   

There are two parts to the Pollution Buyback Endorsement. 
The first part identifies what type of claims are potentially covered, claims
rising from: (1) a personal injury; (2) a bodily injury; or (3) a loss of,
damage to or loss to use of property.  It is undisputed that  Baughn=s claim is one for
personal or bodily injury.  

The second part of this endorsement attaches an additional
limit to liability for a Aloss.@  Liability for a Aloss@ must be one that
is: (1) accidental; (2) became known to the insured within seven days after its
commencement; and (3) reported in writing to Underwriters within 14 days after
the insured became aware of such Aloss.@  Underwriters
argue that Furmanite did not become aware of Baughn=s claim within
seven days after its commencement.  Thus, Underwriters contend, coverage has
not been triggered under the Pollution Buyback Endorsement.








To determine coverage under the Pollution Buyback
Endorsement, we must determine the meaning of Aloss,@ and whether
Baughn=s injury
constitutes a Aloss@ for purposes of the Pollution Buyback
Endorsement.  In determining the meaning of Aloss,@ we apply the
ordinary rules of contract construction.  See Kelley-Coppedge, Inc. v.
Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998); Williams Consol. I,
Ltd./BSI Holdings, Inc. v. TIG Ins. Co., 230 S.W.3d 895, 901-02 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  In applying these rules, our primary concern is to
ascertain the parties= intent as expressed in the language of
the policy.  Williams, 230 S.W.3d at 902.  In determining the intention
of the parties, we look only within the four corners of the insurance agreement
to see what is actually stated, not what was allegedly meant.  See Esquivel
v. Murray Guard, Inc., 992 S.W.2d 536, 544 (Tex. App.CHouston [14th
Dist.] 1999, pet. denied). 

Although the term Aloss@ is not defined in
the Policy, its meaning can be interpreted from a review of the entire policy. 
See Gonzalez v. Mission Am. Ins. Co, 795 S.W.2d 734, 736-37 (Tex.
1990).  The term Aloss@ is used in
conjunction with the phrase Aloss of, damage to, or loss of use of
property@ throughout the
Policy=s exclusions and
buyback endorsements.  The Pollution Exclusion is one of the many provisions
relating Aloss@ to property damage.  Because the
Pollution Buyback Endorsement partially restores coverage for injuries excluded
under the Pollution Exclusion, we read the two provisions together.  See
Provident Life and Acc. Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex.
2003).  The Pollution Exclusion explains that A[t]he words >loss of, damage
to, or loss of use of property= . . .  include . . . loss of, damage to
or loss of property directly or indirectly resulting from subsurface operations
of the Assured.@  The Pollution Exclusion does not use the
term Aloss@ to describe
physical or bodily injury, only property damage.  See Gonzalez, 795
S.W.2d at 736 (AWords used in one sense in one part of a
contract are, as a general rule, deemed to have been used in the same sense in
another part of the instrument, where there is nothing in the context to
indicate otherwise@).  The use of Aloss@ is linked
consistently with property damage, and Underwriters have cited to nothing in
the Policy that purports to characterize a Aloss@ other than for
property damage.  The need for a stringent notice requirement for  property
damage is understandable: injury to property is immediately apparent, and an
insurance company would need to quickly inspect the property.  Bodily injury,
however, is frequently not as apparent as property damage, and, as in the Baughn
case, often manifests itself much later.  








While it is important to recognize that the ordinary
meaning of Aloss@ could be understood to include bodily
injury, our primary task in interpreting a Aloss@ under the
Pollution Buyback Endorsement is Ato ascertain the
parties= intent as
expressed in the language in the policy.@  Williams,
230 S.W.3d at 902 (emphasis added).  In determining the intention of the
parties, Awe look only within the four corners of
the insurance agreement to see what is actually stated, not what
was allegedly meant.@  See id. (emphasis added); see
also Esquivel, 992 S.W.2d at 544. 

Underwrites urge this Court to use the term Aoccurrence,@ which is defined
in the Policy to include bodily injury, in place of Aloss.@  Underwriters
insist that Aoccurrence@ was the
agreed-upon term for the endorsement.   To substitute these words, terms with
different meanings from one another, would require us to rewrite the Policy,
which we cannot do.  See Tenneco, Inc. v. Enter. Prods. Co., 925 S.W.2d
640, 646 (Tex. 1996); Carlton v. Trinity Universal Ins. Co., 32 S.W.3d
454, 465 (Tex. App.CHouston [14th Dist.] 2000, pet. denied)
(holding that an appellate court cannot rewrite the policy or revise its
provisions to avert what the parties perceive to be unfavorable consequences
that might flow from the court=s interpretation and construction). 
Additionally, to determine which word was agreed upon by the parties, we would
have to look to extrinsic evidence.  However, because there is no ambiguity, we
cannot look to evidence outside the Policy.  See Lone Star Heat Treating
Co., Ltd. v. Liberty Mut. Fire Ins. Co., 233 S.W.3d 524, 527 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  We decline Underwriters= invitation to
substitute Aoccurrence@ for Aloss.@  








In the alternative, Underwriters, argue that Aloss@ should be
interpreted to mean Abodily injury caused by seepage, pollution
and contamination.@  We acknowledge that the ordinary meaning
of Aloss@ could be
understood to include Abodily injury caused by seepage, pollution
and contamination.@  However, the Policy does not so state,
and we are required to construe Aloss@ as expressed in
the language in the Policy.  See Williams, 230 S.W.3d at 902.   We look
only within the four corners of the insurance agreement to see what is
actually stated, not what Underwriters claim was allegedly intended or agreed
to by the parties.  See id.; see also Esquivel, 992 S.W.2d at
544.  Here, the use of the term Aloss@ is linked
consistently with property damage.  Furthermore, the Policy does not use the
term Aloss@ to describe
physical or bodily injury, only property damage.  See Gonzalez, 795
S.W.2d at 736 (AWords used in one sense in one part of a
contract are, as a general rule, deemed to have been used in the same sense in
another part of the instrument, where there is nothing in the context to
indicate otherwise@). We find nothing in the Policy that
purports to characterize a Aloss@ other than for
property damage.[1]


Applying the appropriate interpretation and construction
rules, we interpret Aloss@ in the  Pollution
Buyback Endorsement to mean Aloss of, damage to, or loss of use of
property.@  Therefore, the additional notice requirements in the
second part of the endorsementB that the loss became known to the insured
within seven days after its commencement and reported in writing to Underwriters
within 14 days thereafterB have no bearing on claims arising from
personal or bodily injury.  Because Baughn alleges a personal or bodily injury,
not a loss of, damage of, or loss of use of property, the notice conditions
attached to a claim for a Aloss@ are not
applicable to Baughn=s claim.  Accordingly, Baughn=s petition alleges
a claim covered under the Pollution Buyback Endorsement.[2] 
We overrule issues one and two.








We also
note that Underwriters did not raise the issue of whether they were prejudiced
by untimely notice, if any, under the State Board of Insurance=s mandatory endorsement articulated
in Board Order 23080.  See PAJ, Inc. v. Hanover Ins. Co., 243 S.W.3d
630, 632-33 (Tex. 2008).  In issuing Board Order 23080, the State Board of
Insurance required a mandatory endorsement to all CGL policies that precludes
forfeiture of coverage for an insured=s failure to comply with notice or
forwarding conditions unless the insurer is prejudiced.  Id. at 632.  
Because the additional notice requirements for a Aloss@ in the Pollution Buyback Endorsement
have no bearing on coverage for Baughn=s injury,  Furmanite is subject only
to the Policy=s general notice requirement, which provides: A[i]n the event of an occurrence,
written notice . . . shall be given by . . . the Insured to the Insurer(s)=s . . . representative as soon as
practicable.@  There is no contention by Underwriters that Furmanite did not fulfill
this general notice requirement.  Therefore, the issue for lack of proper
notice is not relevant.   

PAROL EVIDENCE

In their third issue, Underwriters argue that the trial
court erroneously considered extrinsic evidence in determining coverage. 
Although affidavits were attached as summary judgment evidence, Underwriters
have not demonstrated with citations to the record that the trial court
considered parol evidence, and nothing in the record supports this contention. 
See Hayes v. Wells Fargo Bank, N.A., No. 01-06-00720-CV, 2007 WL 3038043,
at *4 (Tex. App.CHouston [1st Dist.] Oct. 18, 2007, pet.
denied) (mem. op.).  In fact, Underwriters state in their opening brief that
they merely Apresume that the trial court considered . . . parol
evidence.@  We overrule the third issue.

We affirm the trial court=s judgment.

 

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

 

Panel consists of
Chief Justice Hedges, Justice Anderson, and Senior Justice Price.*

 

 

 

 

 

 

*Senior Justice
Frank C. Price sitting by assignment.









[1]  Additionally, Furmanite argues that Aloss@ should be interpreted to mean the
filing of Baughn=s claim.  There is nothing in the
record to support this interpretation of Aloss.@





[2]  We do not reach the issue of Underwriters= duty to indemnify because there is nothing in our
record reflecting that liability has been determined in the Louisiana lawsuit. 
See GuideOne Elite, 197 S.W.3d at 310 (reasoning that the facts actually
establishing liability in the underlying suit determine whether the insurer
must indemnify its insured).