**ONEBEACON INSURANCE COMPANY as Assignee of Potomac Insurance Company of Illinois, Plaintiff,**

v.

**DON'S BUILDING SUPPLY, INC., Defendant.**

**Civil Action No. 3:05–CV–0731–B.**

United States District Court, N.D. Texas, Dallas Division.

May 23, 2006.

Order Denying Rehearing June 9, 2006.

Timothy Eric Headley, Michelle Macarthur Castro, Cozen O'Connor, Philip Lamb, Quilling Selander Cummiskey & Lownds, Dallas, TX, for Plaintiff.

Thomas B. Alleman, Winstead Sechrest & Minick, Dallas, TX, for Defendant.

### MEMORANDUM ORDER

JANE J. BOYLE, District Judge.

In this action Plaintiff OneBeacon Insurance Company ("OneBeacon") seeks a dec-

laration from this Court that it has no duty to defend or indemnify its insured, Don's Building Supply, Inc. ("DBS"), in a number of lawsuits various homeowners have filed against DBS (and others) in courts throughout northern Texas arising out of, among other things, DBS's distribution and sale of allegedly defective Exterior Insulation and Finish systems ("EIFs").[1] The parties have filed cross motions for summary judgment concerning OneBeacon's duty to defend. For the reasons that follow, the Court concludes that OneBeacon has no duty to defend DBS in connection with the underlying lawsuits, and it accordingly GRANTS OneBeacon's Motion for Summary Judgment (doc. 32) and DENIES Defendant's Motion for Summary Judgment on Liability Issues (doc. 35).

## I. Factual and Procedural Background

DBS is a distributor of construction supplies and materials. (Joint App. to Pl.'s & Def.'s Mots. Summ. J. ["Joint App."] at 1, 65). Potomac Insurance Company of Illinois originally issued three commercial general liability ("CGL") policies of insurance (collectively, the "Potomac Policies" or the "Policies") to DBS consecutively covering the period from December 1, 1993 to December 1, 1996. (Joint App. at 1–62). Potomac later assigned the Policies to OneBeacon. From 2003 to 2005, various homeowners respectively filed some 26 lawsuits (collectively, the "Underlying Actions") against DBS and other construction supply distributors, manufacturers, and

contractors.[2] The plaintiffs in these lawsuits essentially make the same allegations: that the defendants manufactured, distributed, sold and installed EIFs in their homes knowing full well that the product was defectively designed and that it would fail to provide weather-tight cladding as intended; that the defendants knew that any wooden structures adjacent to the EIFs would be vulnerable to wood rot and other damage because of the defective design of the EIFS; and that as a result of defendants' conduct, plaintiffs' homes have suffered extensive damage, resulting in the diminution of their value and the need to retrofit or replace the EIFs. (*See generally* Joint App. at 63–920).[3] The underlying petitions variously assert claims of negligence, gross negligence, fraudulent nondisclosure, fraudulent misrepresentation, and violations of the Texas Deceptive Trade Practices Act ("DTPA").

DBS made demand upon OneBeacon to defend it in the Underlying Actions or otherwise indemnify it from any liabilities resulting therefrom. While OneBeacon initially provided a defense to DBS, it has since denied that it owes any further obligation under the Policies with respect to the Underlying Actions. OneBeacon makes three arguments in support of its view that it does not owe DBS a duty to defend: first, that the pleadings in the Underlying Actions fail to allege that property damage occurred during the coverage term of the Potomac Policies; sec-

---

1. According to these lawsuits, EIFs systems, otherwise known as "synthetic stucco", "are *multi-layered exterior veneer wall systems* consisting of styrofoam insulation board which is mechanically or with an adhesive secured to the plywood or other wooden substance of [a] home, over which is applied a base coat reinforcing fiberglass mesh, and a finish coat." (Joint App. at 64).

2. Twenty-five of the suits were filed by the same law firm and the petitions in those cases

are virtually identical in form and substance. The 26th lawsuit was filed by a different law firm but generally makes the same substantive allegations. (*See generally* Joint App. at 63–920).

3. DBS appears to concede that OneBeacon has no duty to defend it in four of the underlying 26 lawsuits because those suits concern homes that were built after the Potomac Policies had expired. (Def.'s Mot. Summ. J. Brief ["Def.'s MSJ Brief"] at 5–6).

ond, that the damage alleged in the Underlying Actions was not caused by an "occurrence" as defined by the Policies; and third, that a policy exclusion applies which precludes coverage. Because the resolution of OneBeacon's first ground for summary judgment is dispositive of One-Beacon's obligations under the Policies, the Court focuses its attention on that ground.

## II. Summary Judgment Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes about material facts will preclude the granting of summary judgment. *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir.1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.; Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgement is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' ... by 'conclusory alle-

gations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (emphasis in original) (quoting FED.R.CIV.P. 56(e)). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the nonmovant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Given that the parties do not dispute the basic facts as they pertain to the pending motions for summary judgment, this case is particularly amenable to summary disposition. *See Jim Johnson Homes, Inc. v. Mid–Continent Cas. Co.*, 244 F.Supp.2d 706, 713 (N.D.Tex.2003). The motions present pure questions of law and are now ripe for determination.

## III. Analysis

### A. Duty to Defend Legal Standards

The parties agree that Texas law controls the interpretation of the Policies. *Cleere Drilling Co. v. Dominion Exploration & Prod., Inc.*, 351 F.3d 642, 646 (5th Cir.2003). In Texas, the duty to defend and the duty to indemnify are distinct duties. *Farmers Texas County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997). The duty to defend is broader than the duty to indemnify. *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir. 1998) (citing *Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Minerals Corp.*, 1 F.3d 365, 369 (5th Cir.1993)). Thus, "[l]ogic and common sense dictate that if there is no duty to defend, then there must be no duty to indemnify." *Id.* (citing *W. Her-*

itage Ins. Co. v. River Entm't, 998 F.2d 311, 315 (5th Cir.1993)). For this reason, the Court will first examine whether One-Beacon has a duty to defend DBS in the Underlying Actions.

■ In determining whether an insurer has a duty to defend, the Court looks to the "eight corners" formed by the allegations of the underlying pleadings and the language of the insurance policy. *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997). An insured is only entitled to a defense from its insurer if the factual allegations in the most recent pleadings allege facts that are within the scope of coverage. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex.2002). If any claim alleged by the underlying pleadings is potentially within the policy coverage, the insurer is obligated to defend. *CU Lloyd's of Texas v. Hatfield*, 126 S.W.3d 679, 682 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). The factual allegations in the underlying pleadings are afforded a liberal interpretation and must be taken as true. *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir.2004); *Nat'l Union Fire Ins. Co. v. Merch. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997). A party claiming coverage under an insurance policy bears the burden of showing that a claim against it is potentially within the scope of coverage, while the insurer must prove the applicability of a policy exclusion. *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998).

**B. The Relevant Policy Provisions**

The CGL policies at issue in this case obligate OneBeacon to defend any suit brought against DBS to recover for "property damage" but only if the property damage: (1) is caused by an "occurrence"; and (2) occurs during the policy period. (Joint App. at 3). An "occur-

rence" is defined to mean an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Joint App. 13). "Property damage" is defined as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

(Joint App. at 14). The Policies are clear that the property damage must occur during the policy coverage term. The critical question, then, forming the crux of the parties' disagreement, is whether the underlying pleadings allege that "property damage" occurred to the underlying claimants' homes during the December 1993– December 1996 period covered by the Policies. The Court must therefore determine 1) at what point the applicable law says that property damage is triggered under a CGL policy; and 2) whether, applying the appropriate trigger point, the pleadings in the Underlying Actions allege property damage during the policy period. *See Mathews Heating & Air Conditioning LLC v. Liberty Mut. Fire Ins. Co.*, 384 F.Supp.2d 988, 993 (N.D.Tex.2004).

**C. When Does "Property Damage" Occur Under Texas Law?**

■ OneBeacon contends that property damage "occurs" when the damage becomes "manifest". This is the so-called "manifestation rule". While the Texas Supreme Court has not expressly adopted or rejected this rule, intermediate appellate courts in Texas have embraced it, as has the Fifth Circuit applying Texas law. *See Guar. Nat'l Ins. Co. v. Azrock Indus., Inc.*,

211 F.3d 239, 246–47 (5th Cir.2000) ("Texas courts have held that property damage 'occurs' within the meaning of a CGL policy not when the causal negligence occurs but when the damage becomes manifest or identifiable."); *Am. Home Assurance Co. v. Unitramp*, 146 F.3d 311, 313 (5th Cir. 1998) ("A party sustains actual damage when it sustains damage that is readily apparent."); *State Farm Mut. Auto. Ins. Co. v. Kelly*, 945 S.W.2d 905, 910 (Tex. App.-Austin 1997, writ denied) ("Texas courts have held that property loss occurs when the injury or damage manifested."); *Dorchester Dev. Corp. v. Safeco Ins. Co.*, 737 S.W.2d 380, 383 (Tex.App.-Dallas 1987, no writ) ("[N]o liability exists on the part of the insurer unless the property damage manifests itself, or becomes apparent, during the policy period.").

Relying on Texas law, the Fifth Circuit has explained that damage is "manifest" when it is "readily apparent", "identifiable" or "capable of being easily perceived, recognized and understood." *Unitramp*, 146 F.3d at 313–14 (citing *Cullen/Frost Bank of Dallas v. Commonwealth Lloyd's Ins. Co.*, 852 S.W.2d 252, 257–58 (Tex.App.-Dallas 1993, writ denied)). In *Unitramp*, a shipper (Unitramp) chartered a cargo vessel and bought fuel for the vessel from a fuel broker (Enjet). *Id.* at 312. Enjet supplied the fuel on June 9, 1993. When it was loaded aboard the ship, Unitramp sent a sample to a lab for testing. On June 14, after the ship was at sea, Unitramp received a report from the lab indicating that the fuel supplied by Enjet contained excessive water. The vessel was diverted to another port to exchange fuel, and Unitramp later sued Enjet to recover its loss from the resulting delay.

The question was whether insurance coverage applied under Enjet's policy with American Home Assurance Company. *Id.* at 313. As of June 9, 1993, when the diluted fuel was loaded, the American policy did not cover liability arising from operations at the particular Enjet facility that supplied the fuel. Three days later, on June 12, the policy was renewed to cover that facility. Two days after that, on June 14, Unitramp learned that the fuel was watered down. Thus, coverage hinged on when the damage was deemed to have occurred—on June 9 when the fuel was loaded onto the vessel, or on June 14 when the injury was uncovered.

In rendering its decision, the *Unitramp* Court relied on the Dallas Court of Appeals's decision in *Cullen/Frost*. In *Cullen/Frost*, the insured Bank sold a number of condominium units to various purchasers throughout 1984 and 1985. 852 S.W.2d at 254. The purchasers later sued the Bank after inspections conducted in Spring 1986 revealed certain defects in the units, including structural damage, drainage problems, floor displacement, warped windows and doors, and wood rot. *Id.* at 258. The *Unitramp* Court characterized the deterioration that occurred in *Cullen/Frost* as "not apparent because it was hidden"— i.e. "not readily observable by the senses". *Unitramp*, 146 F.3d at 314. It was only when inspections were conducted in 1986 that the problems became "apparent". *Id.* But the *Unitramp* Court was quick to point out that damage does not necessarily become "apparent" only when it is "discovered." To illustrate, the Court used the example of a buyer who purchased a home with a missing roof but "through sheer indolence" did not notice the defect until a year later. *Id.* In such a case, the Fifth Circuit explained, it could not be said that the defect only became apparent when it was actually discovered; rather, damage becomes apparent when it is "visible to the naked eye", or is "readily observable by the senses." Applying these principles to the facts in *Unitramp*, the Fifth Circuit concluded that the watered nature of the fuel supplied by Enjet was not apparent at

the time it was loaded onto Unitramp's vessel because the defect was not visible to the naked eye at that time and did not become apparent until the test results were later received. *Unitramp*, 146 F.3d at 314. Only at that point, the Court determined, did the "property damage" occur. *Id.*

The Fifth Circuit reaffirmed the manifestation trigger for property damage claims in *Azrock*, 211 F.3d at 246–48. There, a manufacturer of floor tiles containing asbestos fibers was sued in around 33 different actions for personal injuries allegedly caused by asbestos exposure and was sued in one case for property damage arising from asbestos installation. *Id.* at 241–42. With respect to the personal injury claims, the Court observed that courts have developed differing theories as to when coverage is triggered in the latent disease context, among them being a manifestation theory and an exposure theory. *Id.* at 244–46. Under the manifestation theory, the underlying disease becomes "manifest" when it is diagnosed or when its impairing symptoms are felt. *Id.* at 245. Under the exposure theory, by contrast, coverage is triggered at the time the claimant is exposed to the injury causing agent, even if symptoms do not develop or a condition is not diagnosed until later. *Id.* The Fifth Circuit adopted a form of the exposure theory with respect to the personal injury claims—in those cases coverage under the CGL policies at issue was triggered if the underlying pleadings alleged exposure to the products containing asbestos during the policy period and that such exposure caused bodily injury, even if an asbestos-related condition was not diagnosed until after the policy had expired. *Id.* at 250. Although the Fifth Circuit applied an exposure trigger to the personal injury claims, it explained that Texas law recognizes a sharp distinction between personal injury cases in the progressive disease context and property damage

claims. *Id.* at 247. In property damage cases, the Court reiterated that the "manifestation" of injury triggers coverage. *Id.* Accordingly, with respect to the lone property damage claim at issue in that case, the Court held that the district court correctly applied a manifestation trigger under Texas law. *Id.* at 248. Because the district court found that "manifest, identifiable damage" did not occur to property during the policy period, the insurance company had no duty to defend.

Despite the body of Texas and Fifth Circuit law applying a manifestation trigger to property damage claims, DBS urges the Court to apply an exposure trigger to the property damage at issue in this case, relying principally on an opinion from the Houston Court of Appeals that was decided post-*Azrock*. *See Pilgrim Enters., Inc. v. Maryland Cas. Co.*, 24 S.W.3d 488, 497–98 (Tex.App.-Houston [1st Dist.] 2000, no pet.). The facts of *Pilgrim* are as follows. Pilgrim, an operator of dry cleaning facilities, purchased insurance from various insurers over the years, including four consecutive policies from Maryland Casualty Company ("Maryland") from December 1981 through December 1985. *Id.* at 490. Pilgrim had long used a hazardous substance—perchloreothylene ("PCE")—in its operations. In 1994, Pilgrim conducted soil sampling at some of its facilities and discovered PCE contamination in the soil and groundwater. *Id.* In 1996, seven lawsuits were filed against Pilgrim arising from the contamination. Pilgrim requested that Maryland provide it a defense to the suits. Although Maryland initially agreed to do so, it later withdrew its offer. Pilgrim then filed suit against Maryland and other insurers. Maryland argued that it only had a duty to defend under the policies if the alleged property damage became manifest during a policy period. Because the underlying pleadings did not allege that the property damage manifested during the relevant policy periods, Ma-

ryland contended that it was not obligated to provide Pilgrim a defense.

Like the Policies in this case, the Maryland policies in *Pilgrim* provided coverage for property damage resulting from an "occurrence", defined there as "an accident, *including continuous or repeated exposure to conditions,* which results in bodily injury or property damage neither expected or intended from the standpoint of the insured." *Id.* at 494 (emphasis in opinion). The *Pilgrim* Court held that under this definition coverage for both bodily injury *and property damage* resulting from PCE contamination was triggered by exposure to PCE. *Id.* at 497–98. This holding was significant because it adopted, for the first time in Texas, an exposure trigger for *property* damage:

> The Maryland policies in question neither use the word "manifest" nor state that injury or damage must be identified within the policies' time period. Each policy's definition of "occurrence" contemplates that covered injury or damage can arise from accidents of "continuous or repeated exposure" to chemicals, and each policy defines "bodily injury" or "property damage" as "bodily injury, sickness, or disease" or "physical injury to or destruction of tangible property" occurring during the policy period. Thus, the policies contemplate that harm caused by continuous exposure during a policy period will be covered by that policy.
>
> Here, the Maryland policies do not define an occurrence as an event happening *within* a policy period, but as "an accident, including continuous or repeated exposure to conditions, which *results* in bodily injury or property damage." (Emphasis added.) The policies' time restriction is found in the definitions of "bodily injury" or "property damage," which require the *harm* to occur during the policy period.... [W]e find that the policies cover physical inju-

ry or property damage caused by exposure during the policy periods, even if the contamination began before the policy periods.

*Id.* at 497, 499 (emphasis in original).

The *Pilgrim* Court acknowledged that its holding conflicted with the Fifth Circuit's holding in *Azrock* that property damage is determined according to a manifestation trigger; however, the *Pilgrim* Court rationalized that the Fifth Circuit was "constrained to follow Fifth Circuit precedent on property damage[.]" *Id.* at 497. Since (and notwithstanding) *Pilgrim,* federal district courts in Texas, adhering to the Fifth Circuit's interpretation of Texas law, have continued to apply a manifestation trigger to property damage claims. *See e.g. Mathews,* 384 F.Supp.2d at 994 (following *Azrock* and holding that a manifestation trigger applies to property damage claims due to mold); *Flores v. Allstate Texas Lloyd's Co.,* 278 F.Supp.2d 810, 815–16 (S.D.Tex.2003) (citing *Unitramp* and holding that "[u]nder Texas law, a party cannot be said to sustain actual property damage until such damage becomes manifest."); *Vesta Fire Ins. Corp. v. Nutmeg Ins. Co.,* 2003 U.S. Dist. LEXIS 25324, at *21–24 (W.D.Tex. Sept. 29, 2003) (acknowledging *Pilgrim* but following *Azrock* for the proposition that under Texas law courts should apply the manifestation theory to cases involving allegations of property damage).

The Court is not persuaded by DBS's argument that cases dealing with a continuous ongoing process are somehow exempt from being subject to a manifestation trigger. In support of its argument, DBS relies in part upon the Dallas Court of Appeals's decision in *Cullen/Frost.* The policies at issue in *Cullen/Frost* defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor in-

tended from the standpoint of the insured" or as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Cullen/Frost*, 852 S.W.2d at 257. The *Cullen/Frost* Court held that

In cases involving continuous or repeated exposure to a condition, there can be more than one manifestation of damage and, hence, an occurrence under more than one policy. Under the definitions of occurrence at issue here, there can be a new occurrence each time the complaining party suffers damage. *See Dorchester Dev. Corp.*, 737 S.W.2d at 383. We reject the argument that there can be only one occurrence when the facts allege continuous or repeated exposure causing continued or multiple property damages over an extended period of time.

*Id.* at 257. From this passage DBS concludes that "*Cullen/Frost* clearly supports Don's position (and the holding of *Pilgrim*) that where continuing injuries are alleged, a multiple trigger properly applies." (Def.'s Resp. to Pl.'s Mot. Summ. J. ["Def.'s Resp. Brief"] at 6). DBS reads too much into this passage of *Cullen/Frost*. True, the court there did acknowledge that there can be more than one occurrence under an insurance policy in repeated exposure cases, but only where there is more than one *manifestation* of damage. In fact, the Dallas Court elsewhere reaffirmed the principle enunciated in its earlier opinion in *Dorchester* that "the occurrence takes place when the property damage manifests itself." *Cullen/Frost*, 852 S.W.2d at 258. This Court thus rejects DBS's contention that a manifestation trigger does not apply to repeated exposure cases. *See Snug Harbor, Ltd. v. Zurich Ins.*, 968 F.2d 538, 544 (5th Cir.1992) (citing *Blue Streak Indus. v. N.L. Indus., Inc.*, 650 F.Supp. 733, 736 (E.D.La.1986)

(even where accident is a gradual process, coverage is still not afforded under CGL policy if results of accident occur after the policy expired)).

The Court's view is buttressed by the Dallas Court of Appeals's decision in *Aetna Casualty and Surety Co. v. Naran*, 1999 WL 59782 (Tex.App.-Dallas Feb. 10, 1999, pet. denied), which was discussed approvingly by the Fifth Circuit in *Azrock*. *See Azrock*, 211 F.3d at 247. In *Naran*, the home, garage, and two cars of a property owner (Naran) were destroyed by fire. *Naran*, 1999 WL 59782 at *1–3. Naran alleged that the fire was caused by an improperly installed catalytic converter to one of his cars. Relying on expert testimony, Naran theorized that the heat from the catalytic converter had the effect of gradually removing moisture from the carpet in his car, such that, eventually, the heat from the converter caused the carpet to ignite. *Id.* at *3. Naran's experts testified that the heating process, called pyrolysis, was a continuous process of damage that ultimately resulted in the conflagration that consumed Naran's property.

The insurance policies in question in *Naran* defined an "occurrence" or "accident" to include "continuous or repeated exposure" to conditions that resulted in property damage. Naran urged the court to apply an exposure trigger because the damage sustained by his property was the result of a continuous process and involved a continuing ongoing injury that was occurring prior to the property-destroying fire. The court declined Naran's invitation to apply an exposure theory, stating that "the only theory ever applied in Texas has been the manifestation theory." *Id.* at *4 (citing *Kelly*, *Dorchester*, and *Cullen/Frost*).[4]

Like DBS, Naran argued that *Cullen/Frost* supported his continuous injury

4. *Naran* was decided before *Pilgrim*.

theory. The *Naran* Court disagreed, stating that "[w]e do not read *Cullen/Frost* as holding that continued and repeated exposure to a condition relieves a party from proving that property damage manifested during the policy period. To the contrary, *Cullen/Bank* [sic] cited *Dorchester's* manifestation theory with approval[.]" *Id.* at *4. Even accepting the questionable premise that the loss of moisture to the carpet in Naran's car itself constituted property damage, the *Naran* Court observed that the record was devoid of any evidence suggesting that the property damage was manifest or apparent before the fire, which occurred after the policy period had expired. *Id.* at *5.

■ In conclusion, following *Azrock* and *Unitramp* and the Texas authorities upon which those opinions rely, this Court will apply a manifestation trigger to the property damage claims alleged in the Underlying Actions. The Court simply disagrees with DBS's position that the Houston Court of Appeals's decision in *Pilgrim* is "controlling", despite the fact that it was issued after *Azrock*. (Def.'s MSJ Brief at 18). Settled law provides that a federal district court must follow its circuit court's interpretation of state law "absent a subsequent state court decision or statutory amendment that render[s] [the Fifth Circuit's] prior decision clearly wrong." *Batts v. Tow–Motor Forklift Co.*, 66 F.3d 743, 747–48 (5th Cir.1995); *Woolley v. Clifford Chance Rogers & Wells, L.L.P.*, 2004 WL 57215, at *3 (N.D.Tex. Jan.15, 2004). As set forth above, the Fifth Circuit has long adopted and applied a manifestation trigger to property damage claims under its interpretation of Texas law. Because nothing in *Pilgrim* renders that body of established Fifth Circuit precedent "clearly wrong", the Court must and does follow the law as articulated by *Azrock* and *Unitramp*.

## D. Do the Pleadings in the Underlying Actions Allege That Property Damage Manifested During the Coverage Period?

■ The Court must next determine whether the pleadings in the Underlying Actions allege that damage or injury manifested during the 1993–1996 coverage period. OneBeacon argues that coverage is not implicated because all of the claimants in the Underlying Actions plead the discovery rule and in so doing affirmatively plead that the damage to their property did not become manifest until well after the coverage term of the Policies expired.[5] Twenty-five of the 26 underlying petitions plead the discovery rule as follows:

*Discovery Rule Applies*

The injury to Plaintiffs was inherently undiscoverable in that the defects inherent in the EIFS are latent. The defects cause damage within the wall cavity which is not readily apparent to one examining the exterior of the EIFS surface. As a result, the named Plaintiffs would not, in the exercise of reasonable diligence, immediately perceive, observe or discover EIFS's defects.

(*See e.g.* Joint App. at 86).[6] Thus, the pleadings in these cases, which the Court

---

**5.** OneBeacon relies heavily on an unpublished opinion, *Amerisure Ins. Co. v. C–Cure Corp.*, No. H–03–3408 (S.D.Tex. Aug. 19, 2004), in support of its position. Because OneBeacon failed to provide the Court with a copy of this opinion, and because the opinion is not otherwise available on an electronic legal research database, the Court has not considered the opinion in making its ruling.

**6.** The 26th action similarly alleges that "[t]he EIFs was designed and installed to maintain its outward appearance despite deterioration and damage beneath the surface of its finish coat and despite the fact that no reasonable means exist that would enable homeowners, such as Plaintiffs, to discover the damage occurring beneath the exterior surfaces of

must accept as true, expressly allege that the complained of property damage was "latent", not "readily apparent", or "capable of being easily perceived"—in other words, that it was not "manifest". *See Unitramp*, 146 F.3d at 314. The 25 petitions do not identify the precise point at which the damage did finally become apparent or observable; however, they allege that "[d]amage to the moisture-sensitive substrate of the home cannot be detected without specialized testing" and that "[s]uch damage remained undiscovered by the Plaintiffs *until recently*." [7] (*See e.g.* Joint App. at 177) (emphasis added).[8] The earliest of the Underlying Actions was filed on August 13, 2003; thus under any reasonable construction of the petitions any "recent" point before that date would still be well after coverage under the Potomac Policies expired in December 1996. OneBeacon also points out that, to avoid the two-year statute of limitations that applies to the causes of action asserted by the underlying claimants, the defects must have been discovered at least two years prior to the dates the petitions were respectively filed.[9] Thus, the earliest point at which any damage could have been discovered is August 13, 2001, well beyond the 1993–1996 time frame encompassed by the Policies.[10] The Court is of course aware that the Fifth Circuit counseled in Unitramp that "manifestation" of damage does not necessarily equate to its "discov-

ery." Nevertheless, the allegations in the underlying petitions easily meet the Fifth Circuit's definition of "manifest"—the plaintiffs allege that the damage is "not readily apparent" and that they could not "immediately perceive, observe, or discover EIFs defects" until "shortly before" those actions were filed. (Joint App. at 75); *Unitramp*, 146 F.3d at 313–14 (" 'Apparent,' like 'manifest,' means 'capable of easy perception.' "). In the absence of any other allegations in the underlying pleadings demonstrating that property damage manifested on or before December 1, 1996, DBS cannot meet its burden of proving coverage under the Policies. *See Am. Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 848 (Tex.1994) (insurer is not legally obligated to defend a suit against its insured if petition does not allege facts within the scope of coverage).

Although DBS concedes that the petitions in the Underlying Actions uniformly allege that the damage within the wall cavities of the homes caused by the EIFs is "not readily apparent" and that "the moisture-sensitive substrate of the home cannot be determined without specialized testing," it points out that 25 of the 26 underlying petitions do allege that "injury to the home actually began to occur on the occasion of the first penetration of moisture behind the EIF System" which would have occurred within six months to one year after the application of the EIFs. (*See*

EIFS; thus, making the defect inherently nondiscoverable". (Joint App. at 136–37).

7. Other plaintiffs allege that the damage remained undiscovered until "shortly before the filing of this case." (*See e.g.*, Joint App. at 79).

8. The 26th suit alleges that the damage caused by the failure of the EIFs was discovered "within two years of filing this suit." (Joint App. at 137).

9. A two-year limitations period applies to claims in the Underlying Actions for negli-

gence, gross negligence and for violations of the Texas DTPA. Tex. Civ. Prac. & Rem.Code § 16.003(a) (negligence and gross negligence); Tex. Bus. & Com Code § 17.565 (DTPA); *Resolution Trust Corp. v. Acton*, 844 F.Supp. 307, 316 (N.D.Tex.1994). A four-year statute of limitations applies to the fraud-based claims that are asserted. Tex. Civ. Prac. & Rem.Code § 16.004(a).

10. The claims would also be barred even under a four-year limitations period.

*e.g.* Joint App. at 177). The 26th lawsuit also alleges that the "wall rot and decay of the wooden building components" caused by the defective EIFs continued from the time the water first intruded until the present day. (Joint App. at 136).

Although the underlying pleadings allege that damage to the homes began to occur upon the first penetration of moisture from behind the EIFs system, and that the damage began to take place shortly after the EIFs was installed, this does not change the fact that the pleadings affirmatively allege that this damage did not become identifiable or apparent until "shortly before" the suits were filed or until, at most, two years before they were filed. (Joint App. at 79, 137). As discussed above, under Texas law and Fifth Circuit authorities applying Texas law, the key trigger point for coverage purposes in property damage cases is when the damage becomes manifest or identifiable, not when the injury-causing event first begins to occur. *See Azrock,* 211 F.3d at 248 (manifestation trigger applied to property damage claim arising from asbestos installation); *Unitramp,* 146 F.3d at 314 (damage was not manifest when watered down fuel was loaded but became so only after testing revealed defect); *Snug Harbor,* 968 F.2d at 544 (citing *Blue Streak Indus.,* 650 F.Supp. at 736 (even if accident is gradual process, results of accident must occur during policy period to invoke coverage)); *AAF–McQuay, Inc. v. Northbrook Prop. and Cas. Ins. Co.,* 1999 WL 33447378, at *4 (E.D.Tex. Jan.19, 1999) (even though policy did not explicitly state that property damage must be apparent during policy period, the policy did state that property damage must "occur" during the policy period, and controlling precedent provides "that damage does not 'occur' until it is 'perceivable, recognizable and understandable.' "); *Carpenter Plastering Co. v. Puritan Ins. Co.,* 1988 WL 156829, at *5 (N.D.Tex. Aug.23, 1988)

(finding that damage to interior finishes, ceiling and carpet as a result of water leaks through exterior wall system occurred "upon first indication of the problem" and remarking that manifestation trigger represents "a more objective approach" to determine when damage occurs); *Dorchester,* 737 S.W.2d at 383 (structural deterioration not manifest until inspections conducted); *Naran,* 1999 WL 59782, at *5 (even assuming that moisture removal caused independent damage during the policy period, damage did not manifest until fire occurred after the policy period). DBS has simply failed to meet its burden to show that the underlying pleadings allege that property damage manifested during the coverage term; on the contrary, any fair reading of those pleadings makes clear that the damage did not manifest until coverage under the Potomac Policies had expired.

■ DBS also argues that damages arising from the loss of use of property that are alleged in the Underlying Actions implicate coverage under the Policies. Twenty-five of the 26 lawsuits allege damages for the cost of the loss of use of plaintiffs' homes during the repair and re-clad period of the EIFs. (*See e.g.,* Joint App. at 192). DBS points out that the Policies define "property damage" to include loss of use of tangible property regardless of whether that property is itself physically injured. Loss of use of tangible property resulting from "physical injury" to that property is "deemed to occur at the time of the physical injury that caused it" and loss of use of the tangible property that is not physically injured is "deemed to occur at the time of the 'occurrence' that caused it.' " (Joint App. at 13–14). According to DBS, "if there is an allegation which creates the potential for physical injury during the policy period, any later loss of use—which definitely is alleged here—is

deemed to have occurred in the policy period." (Def.'s MSJ Brief at 13). DBS ignores, however, the plain restrictive language of the Policies stating that loss of use shall be deemed to occur either "at the time of the physical injury that caused it" in the case where property is physically injured or "at the time of the 'occurrence' that caused it" in the case where property is not physically injured. Thus, DBS must show that the underlying pleadings allege either that the "physical injury" or the "occurrence" causing the loss of use occurred during the coverage period.

DBS does not specifically identify whether it is claiming that the loss of use allegations relate to tangible property that is "physically injured". Nevertheless, the Underlying Actions clearly allege that some form of physical damage occurred to the homes as a result of moisture intrusion caused by the defective EIFs and that the plaintiffs lost or will lose the use of their homes when repairs are conducted. (Joint App. at 80, 87). And presumably, parts of the homes were undamaged but may nevertheless be rendered unusable due to the contemplated repair process. The Court will accordingly analyze whether the underlying pleadings trigger loss of use coverage under the Policies assuming that the plaintiffs lost use of both injured and uninjured tangible property.

Under the Policies, loss of use resulting from physical injury to property is deemed to have occurred "at the time of the physical injury that caused it[.]" (Joint App. at 14). Thus, the Court must determine when the "physical injury" causing the loss of use occurred. Although DBS fails to fully develop its argument, DBS is presumably contending that the "physical injury" ultimately causing the loss of use of the homes was the initial water penetration allowed by the defective EIFs which allegedly began to occur soon after the EIFs was installed. The Court finds,

however, that the "time of the physical injury" causing the loss of use must instead be measured by the time at which the injury manifested. One of the Policies' definitions of "property damage" is "[p]hysical injury to tangible property". (Joint App. at 14). As explained above, the prevailing view in Texas and in this circuit is that "property damage" occurs "when the injury or damage is manifested." *See e.g.*, *Kelly*, 945 S.W.2d at 910. It would be a peculiar reading of the Policies indeed if they were interpreted to mean that the loss of use of injured property could be deemed to occur prior to the time at which the damage to the tangible property causing the loss of use is itself deemed to have occurred under Texas law. Rather, the "loss of use" provision simply allows the insured to relate the loss of use back to the time of the underlying injury or damage, which, under Texas law, is determined according to a manifestation trigger.

With respect to the loss of use of property that is not physically injured, the Policies provide that that loss of use occurs "at the time of the 'occurrence' that caused it." (Joint App. at 14). DBS argues that the homes' exposure to water intrusion was the "occurrence" causing the plaintiffs to lose the use of their homes. (Def.'s MSJ Brief at 16). Under Texas law, however, the time of an "occurrence" is when the complaining party was actually damaged, as measured by when the damage becomes "readily apparent". *See Unitramp*, 146 F.3d at 313; *Dorchester*, 737 S.W.2d at 383. As the Fifth Circuit has stated, it is "apparent from Texas caselaw" that "[t]he date of occurrence is when the damage is capable of being easily perceived, recognized and understood." *Unitramp*, 146 F.3d at 314; *Azrock*, 211 F.3d at 247 (stating that in *Unitramp*, "we held that the 'occurrence' was not the date the tainted fuel was loaded, but the date the

resulting damage become capable of being easily perceived or recognized, such as by chemical testing of the fuel."). As earlier discussed, the pleadings in the Underlying Actions make clear that the damage to the claimants' homes did not become "apparent" or "easily perceived" until shortly before those cases were filed, well after the expiration of the Potomac Policies. Accordingly, there is no duty to defend.

DBS relies upon an unpublished decision from the Amarillo Court of Appeals in support of its view that coverage is afforded under the loss of use provision of the Policies. *See Travelers Indem. Co. v. Page & Assoc. Constr. Co.,* 1998 WL 720957 (Tex.App.-Amarillo 1998, no writ), *vacated in part by* 1999 WL 7673 (Tex.App.-Amarillo Jan. 8, 1999, pet. denied). In *Travelers*, Travelers Indemnity Company ("Travelers") issued two successive CGL policies to its insured, Page & Associates Construction Co. ("Page"), for the period from January 1, 1985 through February 21, 1986. *Id.* at *1. During that time Page undertook construction as general contractor of a large building. In late 1987, after construction had been completed and the policy period had expired, the owner noticed cracks in the stucco. By late 1998, the owner suspected that the cracks were caused by structural deficiencies in the masonry work. An engineer confirmed the owner's suspicions. The policies at issue defined "property damage" to include the "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." *Id.* at *4. (emphasis in original). Travelers denied coverage under the Policies, arguing that the damage must manifest during the policy term and that the uncontroverted evidence showed that no physical damage was observed until after the policies had expired. *Id.* at *6. Page, on the other hand, contended that property damage did not occur during the coverage term because the allegedly defective masonry work caused "latent damage" to the structural integrity of the building.[11] *Id.*

The *Travelers* Court held that "[t]he only tangible property physically injured within the policy period, *if any,* were the masonry walls" and that such injury fell within a policy exclusion. *Id.* at *6 (emphasis supplied). The court further found that Travelers's position that property damage must become manifest during the policy period was supported by Texas case law and that Page failed to show that any non-excluded property was physically damaged during the policy periods. *Id.* at *7. With respect to Page's loss of use claim, however, the court stated that

The defective construction of the masonry walls eventually caused physical injury to the stucco and drywall. Even assuming that this injury only occurred after the policy period as Travelers contends, the loss of use necessitated by their repair extended to the other property, fixtures, and furnishings of [the building] which were not injured. The loss of use of this uninjured property brought into effect the second definition of property damage. That definition only requires that the loss of use be caused by an occurrence during the policy period, not that the loss of use occur during the policy period.

There is no dispute that the defective construction was an accident, or that it was the cause of the necessity for subsequent repairs. The resulting loss of the use of tangible property made it an "occurrence" within the meaning of the pol-

---

11. In its description of the facts of *Travelers,* DBS states that Page alleged that the wall suffered latent damage "from water entering through the cracks". (Def.'s Resp. Brief at 8). The *Travelers* opinion, however, makes no mention of water intrusion.

icy. In that the defective construction took place during the policy period, it was an occurrence during the policy period within the policy's second definition of property damage. It is irrelevant that the loss of use occurred after the policy period. . . . We hold that undisputed summary judgment evidence established that the policies at issue provided coverage for damages resulting from loss of use of the building owner's tangible property.

*Id.* at \*5. Thus, the *Travelers* Court's reasoning appears to have proceeded as follows: because the policies defined "occurrence" as an "accident" and because there was "no dispute" that the defective construction itself constituted an "accident", then the defective masonry work, completed during the policy period, constituted an "occurrence during the policy period" that later caused the loss of use of tangible property.

DBS contends that the same result should obtain here. However, as explained above, this Court is obliged to follow the Fifth Circuit's interpretation of Texas law, and it accordingly finds that Fifth Circuit precedent compels a different result than the one reached in *Travelers*. The *Travelers* Court assumed that the occurrence took place at the time of the defective construction, and hence, during the policy period. In *Unitramp*, however, the Fifth Circuit held that "Texas law provides that '[t]he time of the occurrence is when the complaining party actually was damaged, not the time that the wrongful act was committed.'" *Unitramp*, 146 F.3d at 313 (quoting *Cullen/Frost*, 852 S.W.2d at 257); *Snug Harbor*, 968 F.2d at 544 ("Texas courts have concluded that the time of an occurrence is when a claimant sustains actual damage—not necessarily when the act or omission causing that damage is committed."). The "date of occurrence" is the date that the damage became "capable of being easily perceived, recognized and understood." *Unitramp*, 146 F.3d at 314; *Snug Harbor*, 968 F.2d at 544 (holding that even though loss of use occurred during policy period, the manifestation of that loss did not, therefore there was no "occurrence" during the policy period). Notwithstanding the result reached by *Travelers*, the plain allegations in the underlying pleadings in this case make clear that property damage was not "easily perceived" during the coverage period; thus there was no "occurrence" during the policy period and hence no loss of use during the policy period.

## E. Duty to Indemnify

Because the Court has found that One-Beacon has no duty to defend DBS in connection with the Underlying Actions, it necessarily finds that OneBeacon similarly has no duty to indemnify DBS. *See Bailey*, 133 F.3d at 368 ("Logic and common sense dictate that if there is no duty to defend, then there must be no duty to indemnify."); *Griffin*, 955 S.W.2d at 84 ("[T]he duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*.") (emphasis in original); *Acceptance Ins. Co. v. Newport Classic Homes, Inc.*, 2001 WL 1478791, at \*2 (N.D.Tex. Nov.19, 2001) (finding no duty to indemnify where court had previously found no duty to defend).

## IV. Conclusion

Because DBS has failed to meet its burden of showing that the pleadings in the Underlying Actions allege that "property damage" occurred during the coverage term of the Potomac Policies, the Court DECLARES that OneBeacon has no duty to defend or indemnify DBS in connection with the Underlying Actions. OneBea-

con's Motion for Summary Judgment is accordingly GRANTED and DBS's Motion for Summary Judgment on Liability Issues is DENIED.

**SO ORDERED.**

### ORDER DENYING MOTION FOR REHEARING

Before the Court is Defendant Don's Building Supply, Inc.'s ("DBS") Motion for Rehearing (doc. 46) of this Court's May 23, 2006 Memorandum Order granting summary judgment in favor of Plaintiff OneBeacon Insurance Company. In the motion DBS persists in its attempt to convince the Court that it is obliged to follow the Houston Court of Appeals's decision in *Pilgrim Enterprises, Inc. v. Maryland Casualty Co.*, 24 S.W.3d 488, 497–98 (Tex.App.-Houston [1st Dist.] 2000, no pet.), which applied a "continuous trigger" or "exposure" theory to property damage claims within the meaning of a CGL insurance policy, despite the large body of established Texas and Fifth Circuit precedent that applies a "manifestation trigger". *See, e.g. Guar. Nat'l Ins. Co. v. Azrock Indus., Inc.*, 211 F.3d 239, 246–47 (5th Cir.2000); *Am. Home Assurance Co. v. Unitramp*, 146 F.3d 311, 313 (5 th Cir. 1998); *Snug Harbor, Ltd. v. Zurich Ins.*, 968 F.2d 538, 544 (5th Cir.1992); *State Farm Mut. Auto. Ins. Co. v. Kelly*, 945 S.W.2d 905, 910 (Tex.App.-Austin 1997, writ denied); *Cullen/Frost Bank of Dallas v. Commonwealth Lloyd's Ins. Co.*, 852 S.W.2d 252, 257–58 (Tex.App.-Dallas 1993, writ denied); *Dorchester Dev. Corp. v. Safeco Ins. Co.*, 737 S.W.2d 380, 383 (Tex. App.-Dallas 1987, no writ); *Aetna Cas. and Surety Co. v. Naran*, 1999 WL 59782, at *4 (Tex.App.-Dallas Feb. 10, 1999, pet. denied).

The same argument was previously raised by DBS and rejected by this Court. As the Court stated in its May 23, 2006 Memorandum Order: "The Court simply disagrees with DBS's position that the Houston Court of Appeals's decision in *Pilgrim* is 'controlling', despite the fact that it was issued after *Azrock*. Settled law provides that a federal district court must follow its circuit court's interpretation of state law 'absent a subsequent state court decision or statutory amendment that render[s] [the Fifth Circuit's] prior decision clearly wrong.'" (May 23, 2006 Memorandum Order at 14) (quoting *Batts v. Tow–Motor Forklift Co.*, 66 F.3d 743, 747–48 (5th Cir.1995)).

Undeterred, DBS continues to try to imbue *Pilgrim* with precedential force that it simply does not have, this time by relying upon the Fifth Circuit's holding in *FDIC v. Abraham*, 137 F.3d 264 (5th Cir. 1998). According to DBS, *Abraham* stands for the proposition that "federal courts are obligated to follow subsequent state intermediate court decisions when they are contrary to prior federal rulings in the area." (Mot. Rehearing at 2). In reality, however, the *Abraham* Court noted that the Fifth Circuit is "a strict *stare decisis* court", and it reiterated the general rule that a prior Fifth Circuit panel decision should be followed by subsequent panels (and necessarily by district courts) "without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's [prior] decision clearly wrong." *Abraham*, 137 F.3d at 268–69 (quoting *Broussard v. S. Pac. Transp. Co.*, 665 F.2d 1387, 1389 (5th Cir. 1982)) (quoting *Lee v. Frozen Food Express, Inc.*, 592 F.2d 271, 272 (5 th Cir. 1979)). In fact, the *Abraham* Court interpreted the Fifth Circuit's earlier *Broussard* and *Lee* decisions to mean that the "subsequent state court decision" must come "from a state's highest court only". *Id.* It went on to conclude

that when our *Erie* analysis of controlling state law is conducted for the pur-

pose of deciding whether to follow or depart from prior precedent of this circuit, and neither a clearly contrary subsequent holding *of the highest court of the state* nor a subsequent statutory authority, squarely on point, is available for guidance, *we should not disregard our own prior precedent on the basis of subsequent intermediate state appellate court precedent unless such precedent comprises unanimous or near-unanimous holdings from several—preferably a majority—of the intermediate appellate courts of the state in question.*

*Id.* (emphasis added). Accordingly, this Court continues to disagree with DBS that *Pilgrim* is controlling authority in the Fifth Circuit. DBS has failed to show that either the Texas Supreme Court or a *majority* of Texas intermediate appellate courts have, like *Pilgrim*[1], embraced an exposure or continuous trigger theory for property damage claims.

DBS also argues that a judgment recently entered in DBS's favor against another insurance company—Union—in the 116th Judicial District Court of Dallas County (the "Dallas Case") merits reversal of this Court's earlier decision in favor of OneBeacon. According to DBS, the Dallas Case involved one of the houses at issue in this case and also involved identical underlying pleadings and policy provisions. DBS argues that the Dallas court necessarily applied a continuous trigger in finding that Union was obligated to defend DBS in the underlying action at issue. The Court cannot agree with this conclusion based on the limited information before it. First, the judgment in the Dallas Case fails to explain the district court's reasoning for its decision. Second, the briefing in that case appears to have been primarily focused on the question of whether the underlying claimants suffered property damage during the policy period given that they did not purchase the subject house until almost five years after the relevant policies expired. (*See* Ex. B, Pl.'s Mot. Summ. J. at 8; Ex. C, Def.'s Resp. to Pl's Mot. Summ. J. at 17). In this case, in contrast, whether the underlying claimants had an interest in the subject property at the time the damage occurred was never an issue—instead the question was whether the property damage "occurred" within the meaning of the Potomac Policies when it was alleged that the damage caused by the defective EIFs became manifest or when it was alleged that moisture first began to penetrate from behind the EIFs system. Regardless, even if the Court accepted, strictly for argument's sake, DBS's argument that the Dallas Case applied a continuous trigger, it would not affect the Court's earlier holding. Unlike the Dallas court, this Court is bound to follow Fifth Circuit precedent, which, as discussed at length in the Memorandum Order, makes clear that a manifestation trigger applies to property damage claims. *See Vesta Fire Ins. Corp. v. Nutmeg Ins. Co.*, 2003 U.S. Dist. LEXIS 25324, at *21–24 (W.D.Tex. Sept. 29, 2003) (acknowledging split in Texas authority created by *Pilgrim*, but following the Fifth Circuit's holding in *Azrock* ). If this Court is bound to follow the Fifth Circuit's interpretation of Texas law notwithstanding a subsequent contrary decision by a single intermediate Texas court, *see Abraham*, 137 F.3d at 269, then, *a fortiori*, it is bound to adhere to Fifth Circuit precedent despite a subsequent contrary decision by a Texas district court.

---

1. It bears mention that even *Pilgrim* noted that the Fifth Circuit, in *Azrock*, "was constrained to follow Fifth Circuit precedent on property damage[.]" *Pilgrim*, 24 S.W.3d at 497.

Finally, DBS urges the Court to apply a continuous trigger because "[t]he result argued for by OneBeacon puts Don's in the position of having to wait out trial on the merits of the underlying case in order to determine when a homeowner over whom it has no control and with whom it had no contact should have discovered the hidden water damage in his home before being able to obtain a defense from insurers whose policies might provide coverage." (Mot. Rehearing at 3). The Court must confess to a lack of complete understanding of this argument. Indeed, it appears to conflict with DBS's briefing in the Dallas Case, where DBS stated that "[t]he duty to defend is not affected by the facts of the case ascertained before, during, or after the suit." (Ex. C, Def.'s Resp. to Pl.'s Mot. Summ. J. at 4) (quoting *Cullen/Frost*, 852 S.W.2d at 255). In this case, if it could even potentially be said that the underlying pleadings allege that the property damage manifested during the policy period, OneBeacon would be obligated to defend DBS. But such is not the case. To the contrary, the underlying pleadings expressly allege that the complained of property damage was "latent", not "readily apparent" or "capable of being easily perceived"—*i.e.* that it was not "manifest"—until, by any reasonable construction, after the Potomac Policies had expired. Thus, OneBeacon has no duty to defend. *See e.g. Vesta Fire*, 2003 U.S. Dist. LEXIS 25324, at *24–26 (concluding that insurance policies that expired before August 1995 did not give rise to duty to defend where underlying petition, "in an apparent attempt to circumvent potential limitations problems," alleged that damages from foundation movement as a result of negligent construction did not manifest until August 1995).

For the foregoing reasons, the Court DENIES DBS's Motion for Rehearing (doc. 46). In view of the status report filed by the parties on June 7, 2006, there are no further issues that remain for resolution in this case. Accordingly, the Court will issue a judgment by separate instrument.

**SO ORDERED.**